**Joslyn N. WILLIAMS and Robert L. Bostick, Appellants,**

v.

**L. Quincy MUMFORD, Librarian of Congress, et al.**

**No. 73–2120.**

United States Court of Appeals, District of Columbia Circuit.

Argued 31 Oct. 1974.

Decided 10 Feb. 1975.

Rehearing En Banc Denied April 4, 1975.

---

Michael D. Hausfeld, Washington, D. C., with whom Jerry S. Cohen, Washington, D. C., was on the brief for appellants.

Michael G. Scheininger, Asst. U. S. Atty., with whom Earl J. Silbert, U. S. Atty., John A. Terry and Derek I. Meier, Asst. U. S. Attys., were on the brief for appellees.

Roderic Boggs, Washington, D. C., was on the brief for the Washington Lawyers Committee for Civil Rights Under Law as amicus curiae.

Before ROBB and WILKEY, Circuit Judges, and MARKEY,* Chief Judge for the United States Court of Customs and Patent Appeals.

WILKEY, Circuit Judge:

Williams and Bostick are black employees of the Library of Congress. Bostick claims that from the time he began his employment with the Library in 1947 he has been subject to racial discrimination as regards his job classification and promotion. On or about 19 April 1972 Bostick filed a formal complaint alleging discrimination with the Equal Employment Opportunity (EEO) Office of the Library of Congress. Four months later he amended his complaint and alleged discrimination affecting all other black employees of the Library. In November 1972 the EEO Office returned the amended complaint, stating that the office was not equipped to handle broad inquiries into the general policies and practices of the Library.

Williams had been employed as a copyright examiner with the Library since June 1967. Soon after he began his employment with the Library he was elected president of Local 1826 of the American Federation of Government Employees, a union which represents Library employees, and president of a task force named "Black Employees of the Library of Congress." Williams alleges he was active in promoting equal employment in the Library and in aiding employees who brought discrimination actions. In June 1972 he was given notice of removal effective 21 July 1972.[1] The removal was based on charges of material misrepresentations relating to his schooling, made on his 1967 application for the position of copyright examiner. In lieu of removal, on 21 July 1972 the Library accepted a resignation submitted by Williams to be effective on 11 August 1972. However, shortly before the effective date of his resignation, Williams requested that his resignation be withdrawn. After the Library refused to allow the withdrawal, on 11 August Williams filed his administrative complaint with the EEO Office, alleging that his resignation was coerced and that his removal was racially motivated.

Three days later Williams also filed in the District Court an action solely on his own behalf, alleging that his removal was the result of racial discrimination and that his resignation had been coerced. On 20 March 1973 Williams filed an amended complaint, adding an allegation that 180 days had passed without final administrative action on his administrative complaint. At this point Bostick's allegations of discrimination were also added to Williams' complaint. Finally, allegations were added alleging discrimination against all blacks currently employed by the Library, all blacks who had been employed at any time since 1960, and all blacks who had sought employment unsuccessfully since 1960, thus making the complaint on its face a class action.

On 20 August 1973, after a hearing, the District Court denied Williams' and Bostick's request for class certification. The denial was based on two grounds: First, that Williams' and Bostick's claims were not typical of the claims of the class they sought to represent as required by Rule 23(a)(3), Federal Rules of Civil Procedure. Second, given the effective administrative remedies available to federal employees apart from Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972,[2] the class action was not "superior to other available methods for the fair and efficient adjudication of the controversy" as required by Rule 23(b)(3), Federal Rules of Civil Procedure.

On 25 September 1973 an appeal from the refusal to certify a class action was

---

* Sitting by designation pursuant to 28 U.S.C. § 293(a).

1. Williams also contends he was given the notice of removal just one week before he

was to address the American Library Association's convention about the racial employment policies and practices of the Library.

2. 42 U.S.C. § 2000e–16.

taken.[3] We are presented with the question whether the refusal by a district court to certify a class action constitutes an appealable order. On the facts of this case, we decide that such an order is not appealable and therefore dismiss this appeal for lack of jurisdiction.

## I. APPEALABILITY UNDER 28 U.S.C. § 1291

The principal source of our jurisdiction to hear appeals from the District Court is 28 U.S.C. § 1291 which provides: "The courts of appeals shall have jurisdiction of appeals from all final decisions of the district courts of the United States . . . except where a direct review may be had in the Supreme Court." Our task, thus, must be to determine whether the refusal to certify a class action constitutes a final decision. A final decision is not necessarily "the last order possible to be made in a case . . . .";[4] however, to be "final" it must have the effect of resolving litigation on the merits. We have been instructed by the Supreme Court to give a flexible interpretation to "final decision" when used in the context of section 1291. As a result, the requirements of finality must be given a "practical rather than a technical construction."[5] "The inquiry requires some evaluation of the competing considerations underlying all questions of finality—'the inconvenience and costs of piecemeal review on the one hand and the danger of denying justice by delay on the other.' Dickinson v. Petroleum Conversion Corp., 338 U.S. 507, 511 [70 S.Ct. 322, 324, 94 L.Ed. 299] (1950) (footnote omitted)."[6]

Applying this analysis, it becomes apparent that an order refusing to certify a class action is generally not a final decision within the meaning of section 1291.[7] It does not dispose of litigation. It is purely procedural in nature, in that it determines merely the parties to the action without expressing any judgment as to the merits of the case. Moreover, the correctness of the District Court's determination does not evade review since it, along with other procedural decisions, is brought up on appeal after final disposition on the merits.

Having stated the general rule two qualifications must be made and their relevance considered. First, it must be recognized that in some types of cases the refusal to certify a classification, as a practical matter, does dispose of the action. This is because the plaintiff has such a small monetary or other interest to be vindicated in the action that it would not be worth the plaintiff's time to continue the action. In a series of recent cases, the Second Circuit has developed a body of law relating to this type of case, commonly referred to as the "Death Knell" doctrine. Secondly, in some cases a subsidiary controversy develops as an offshoot of the main litigation. A decision disposing of such an offshoot may be held to be a final decision, even if the decision is procedural in nature, if it appears likely that the matter would evade review if taken on appeal after a final disposition of the en-

3. The District Court refused a request to certify the question for appeal under 28 U.S.C. § 1292(b) on 10 October 1973.

4. Gillespie v. United States Steel Corp., 379 U.S. 148, 152, 85 S.Ct. 308, 311, 13 L.Ed.2d 199 (1964).

5. Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 546, 69 S.Ct. 1221, 1226, 93 L.Ed. 1528 (1949).

6. Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 171, 94 S.Ct. 2140, 2149, 40 L.Ed.2d 732 (1974).

7. Caceres v. International Air Transport Assoc., 422 F.2d 141 (2nd Cir. 1970); City of New York v. International Pipe & Ceramics Corp., 410 F.2d 295 (2nd Cir. 1969); Hackett v. General Host Corp., 455 F.2d 618 (3rd Cir.), cert. denied, 407 U.S. 925, 92 S.Ct. 2460, 32 L.Ed.2d 812 (1972); Lamarche v. Sunbeam Television Corp., 446 F.2d 880 (5th Cir. 1971); Siebert v. Great Northern Dev. Co., 494 F.2d 510 (5th Cir. 1974); Walsh v. City of Detroit, 412 F.2d 226 (6th Cir. 1969) (order permitting class action); King v. Kansas City So. Indus., Inc., 479 F.2d 1259 (7th Cir. 1973); Thill Securities Corp. v. New York Stock Exchange, 469 F.2d 14, 17 (7th Cir. 1972) (denial of a motion to strike class action allegations); Gerstle v. Continental Airlines, Inc., 466 F.2d 1374 (10th Cir. 1972).

tire litigation. This has been called the Collateral Order doctrine. We turn now to examine both doctrines in more detail.

## A. The Applicability of the "Death Knell" Doctrine

The "Death Knell" doctrine was developed in the Second Circuit in the crucible of Eisen v. Carlisle & Jacquelin. In *Eisen I*[8] the Second Circuit denied a motion to dismiss an appeal from a District Court order refusing to certify a class action. In that case, Eisen sued on behalf of himself and all odd-lot purchasers and sellers on the New York Stock Exchange alleging antitrust and Securities Act violations. Eisen's claim for damages was only for $70.00. Appropriately enough, the court noted:

> We can safely assume that no lawyer of competence is going to undertake this complex and costly case to recover $70 for Mr. Eisen. . . . If the appeal is dismissed, not only will Eisen's claim never be adjudicated, but no appellate court will be given the chance to decide if this class action was proper under the newly amended Rule 23 [Federal Rules of Civil Procedure].[9]

The Second Circuit faced the same issue soon thereafter in Green v. Wolf Corp. Plaintiff Green and the members of the class alleged that they had been required to pay an excessive price for certain publicly held securities. As the court noted, "Green obviously does not intend to press what will probably be an enormously complex and expensive action to recover less than $1,000."[10] In two cases consolidated under the title Korn v. Franchard Corp.,[11] the court decided that Mrs. Korn's suit for violations of the federal securities laws and for violations of New York law "will go no further without class suit designation." Because Mrs. Korn's losses amounted to $386, the Second Circuit denied a motion to dismiss an appeal denying class action certification. However, in the companion case the actual claims of the representative plaintiffs were for about $8,500. The court concluded, "[t]hat figure is close enough to the federal jurisdictional minimum for certain types of cases to suggest it is sufficient incentive to keep the case alive."[12] Accordingly, the "Death Knell" doctrine was inappropriate in that case and the appeal was dismissed.

In this case, it is clear that both Bostick and Williams have a sufficient incentive to continue this suit. Williams in his original complaint requested reinstatement in his former position. Today Williams in addition would be entitled to approximately two and a half years' back pay should he prevail,[13] an amount which we can safely assume is greatly in excess of $10,000.00. As to Bostick, the request is for a higher GS rating, which he alleges was improperly denied him. In addition, it should be noted that the Equal Employment Opportunity Act amendments specifically provide for a reasonable attorney's fee for the prevailing party at the discretion of the court in just this type of case.[14] It certainly

---

**8.** 370 F.2d 119 (1966), cert. denied, 386 U.S. 1035, 87 S.Ct. 1487, 18 L.Ed.2d 598 (1967).

**9.** 370 F.2d at 120.

**10.** 406 F.2d 291, 295 n. 6 (1968), cert. denied, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969).

**11.** 443 F.2d 1301 (2nd Cir. 1971).

**12.** 443 F.2d at 1306–07. More recently, the "Death Knell" doctrine has been specifically rejected by the Seventh Circuit, King v. Kansas City So. Indus., Inc., 479 F.2d 1259 (7th Cir. 1973), and criticized by the Third Circuit, Hackett v. General Host Corp., 455 F.2d 618 (3rd Cir.), cert. denied, 407 U.S. 925, 92 S.Ct. 2460, 32 L.Ed.2d 812 (1972). However, the vitality of the doctrine has been reasserted by the Second Circuit. General Motors Corp. v. City of New York, 501 F.2d 639 (1974); Kohn v. Royall, Koegel & Wells, 496 F.2d 1094 (1974); Herbst v. International Tel. & Tel. Corp., 495 F.2d 1308 (1974); Shayne v. Madison Square Garden Corp., 491 F.2d 397 (1974).

**13.** 42 U.S.C. § 2000e–5(g), made applicable to the Federal Government by 42 U.S.C. § 2000e–16(d).

**14.** 42 U.S.C. § 2000e–5(k), made applicable to the Federal Government by 42 U.S.C. § 2000e–16(d).

may be questioned whether the "Death Knell" doctrine can ever be applied to a case where attorney's fees are available to the prevailing party.[15]

## B. The Applicability of the Collateral Order Doctrine

The Collateral Order doctrine had its origins in the Supreme Court case of Cohen v. Beneficial Industrial Loan Corp.,[16] in which the Court considered the constitutionality of requiring a plaintiff in a New Jersey federal court to post bond to insure payment of defendant's attorney's fees as required by New Jersey statute. The case was "too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated."[17] In *Cohen* the interlocutory order being appealed was effectively immune from review after judgment. If the District Court's deci-

sion not to apply the New Jersey statute were not reviewable at that point, the defendant would, as a practical matter, be denied any protection under the statute. *Eisen III*[18] is a more recent application of the same doctrine. The District Court decided that the defendants would be required to bear 90% of the cost of notice to the plaintiff class of odd-lot buyers and sellers. Obviously, even if the defendants could have theoretically sought to collect their outlay had they prevailed, there would be little practical possibility of collecting over $20,000 from the over two million members of the class. As the Supreme Court noted on appeal from *Eisen III*:

Analysis of the instant case reveals that the District Court's order imposing 90% of the notice cost on respondents likewise falls within "that small class [of decisions which finally determine claims of rights separable from,

---

**15.** Hackett v. General Host Corp., 455 F.2d at 622–23:

Thus the "death knell" rule would operate only in that narrow category of cases where the object of the suit is the recovery of money damages, and where a statute affords federal jurisdiction regardless of amount. This narrow category is, however, significant for consumer advocates. But even in this field, the "death knell" rationale, based upon the assumption that no competent lawyer would undertake a complicated case to recover a small amount of money, must be qualified by several considerations. A number of federal statutes provide for the award of counsel fees and costs.[3] Indeed the statute under which 3. *E.g.* statutes providing for damages arising from the following improper actions, a single instance of which may harm individual members of large classes, additionally provide that successful plaintiffs' attorneys shall be awarded reasonable attorneys' fees and costs: Failure to disclose under the Truth in Lending Act 15 U.S.C. § 1640 (1971); Unlawful wiretapping, 18 U.S.C. § 2520 (1971). Other statutes place the decision of whether to allow reasonable attorneys' fees and costs within the discretion of the district court: Securities Acts Violations; 15 U.S.C. §§ 77k, 77www; 78i (1971). *See also* 28 U.S.C. § 2678 (1971) providing for reasonable attorneys' fees in suits involving torts committed by the Federal Government where its immunity has been waived.

Mrs. Hackett sues contains such a provision. 15 U.S.C. § 15 (1971). If the "death knell" is to ring for her case the rope is in her attorney's hand. There is no certain basis for the assumption that an interested holder of a small claim will be unable to prevail upon a private attorney to pursue that claim in the hope of being compensated by the award of "reasonable counsel fees" against a wrongdoer. Moreover the burgeoning in recent years of interest in publicly supported legal service organizations and of private support for legal aid and public interest law firms cannot be disregarded.[4] Many small but important 4. See Note, The New Public Interest Lawyers, 79 Yale L.J. 1068 (1970). claims heretofore, for purposes of litigation, beyond the pale of financial practicability, have been successfully litigated by such organizations in recent years. Thus an adverse class action decision may ring out as a death knell on far fewer occasions than superficial analysis would suggest.

**16.** 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949).

**17.** 337 U.S. at 546, 69 S.Ct. at 1226.

**18.** Eisen v. Carlisle & Jacquelin, 479 F.2d 1005 (2nd Cir. 1973), affirmed on this issue, 417 U.S. 156, 94 S.Ct. 2140, 2150, 40 L.Ed.2d 732 (1974).

and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated]." It conclusively rejected respondents' contention that they could not lawfully be required to bear the expense of notice to the members of the petitioner's proposed class. Moreover, it involved a collateral claim unrelated to the merits of the petitioner's claims. Like the order in *Cohen*, the District Court's judgment on the allocation of notice cost was "a final disposition of a claimed right which is not an ingredient of the cause of action and does not require consideration with it" . . . .[19]

In this case, the refusal to certify a class action did not determine collateral claims completely independent of the merits of the case. The order is indistinguishable from other procedural determinations made in the course of discovery and trial. No funds were required to be expended as in *Eisen*, nor rights granted under independent statutes to be dispensed with as in *Cohen*. Above all, the correctness of the District Court's decision is subject to effective review on appeal from final judgment. We hold, in conclusion, that the District Court's refusal to certify a class action in this case did not constitute the "Death Knell" of the action nor was it a collateral and independent determination. Therefore, the decision was not a "final" one within the meaning of section 1291.

## II. APPEALABILITY UNDER 28 U.S.C. § 1292(a)(1)

In the alternative, appellants contend that this court has jurisdiction over this appeal under 28 U.S.C. § 1292(a)(1) which provides:

> The courts of appeals shall have jurisdiction of appeals from: (1) Interlocutory orders of the district courts . . granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court . . . .

It is argued that the net effect of the refusal to certify a class action is considerably to narrow the scope of any possible injunctive relief in the event plaintiffs ultimately prevail on the merits. Appellants cite in support of their position two cases from other Circuits: Brunson v. Board of Trustees [20] and Yaffee v. Powers.[21] Both cases are premised on the assumption that the refusal to certify a class action, since it would eventually affect the scope of equitable relief, itself constituted a modification of or a refusal to issue an injunction. We view this as an unwarranted expansion of the statutory language. By analogy to the reasoning of these courts, most procedural motions in an action requesting equitable relief would be appealable by *either* party. In this view we are supported by the Second Circuit. In its opinion in City of New York v. International Pipe and Ceramics Corp.[22] it rejected the argument that a refusal to certify a class action is appealable under section 1292(a)(1). The court noted, as do we, that the denial of class action treatment constitutes neither issuance nor denial of an injunction.[23]

Although this precise question has never been presented to the Supreme Court, the Court has had to consider the scope of the injunction exception to the

**19.** 417 U.S. at 172, 94 S.Ct. at 1250.

**20.** 311 F.2d 107 (4th Cir. 1962) (per curiam), cert. denied, 373 U.S. 933, 83 S.Ct. 1538, 10 L.Ed.2d 690 (1963).

**21.** 454 F.2d 1362 (1st Cir. 1972). Since briefs were filed in this case, the Ninth Circuit has decided that the dismissal of a class action with leave to amend without class action alle-

gations was appealable under section 1292(a)(1), Price v. Lucky Stores, Inc., 501 F.2d 1177 (1974).

**22.** 410 F.2d 295 (2nd Cir. 1969).

**23.** The Court also stated that "[t]he cases cited by the City dealing with injunctive relief sought by school children to prevent discrimination on the ground of race have no application here." 410 F.2d at 299. The opinion offers us no further elaboration.

final judgment rule. In Switzerland Cheese Association, Inc. v. E. Horne's Market, Inc.,[24] the Court held that the denial of a plaintiff's motion for summary judgment seeking injunctive relief was not a denial or refusal of an injunction within the meaning of section 1292(a)(1). This was because

> . . . the denial of a motion for a summary judgment because of unresolved issues of fact does not settle or even tentatively decide anything about the merits of the claim. It is strictly a pretrial order that decides only one thing—that the case should go to trial. Orders that in no way touch on the merits of the claim but only relate to pretrial procedures are not in our view "interlocutory" within the meaning of § 1292(a)(1).[25]

Although it is difficult to reconcile all of the case law interpreting section 1292(a)(1),[26] it would appear that the Supreme Court in *Switzerland Cheese* has opted for a narrow construction of the statutory language. Although an order denying class action certification *might at some later stage* have an effect on the scope of equitable relief, such orders "in no way touch on the merits of the claim" and thus fall outside of the scope of the section.

Conscious as we are of our responsibility to maintain the jurisdictional balance drawn by the Congress under sections 1291 and 1292, we are particularly reticent to expand upon statutory language which was intended as a limited exception to the final judgment rule.[27] We emphasize that the District Court did not state that the claim for an injunction had no merit, nor that it lacked jurisdiction to grant an injunction, nor even did it express any opinion as to whether injunctive relief was warranted at any particular point in the proceedings. The

---

**24.** 385 U.S. 23, 87 S.Ct. 193, 17 L.Ed.2d 23 (1966).

**25.** 385 U.S. at 25, 87 S.Ct. at 195.

**26.** *See, e. g.*, Enelow v. New York Life Insurance Co., 293 U.S. 379, 55 S.Ct. 310, 79 L.Ed. 440 (1935); Ettleson v. Metropolitan Life Insurance. Co., 317 U.S. 188, 63 S.Ct. 163, 87 L.Ed. 176 (1942); City of Morgantown v. Royal Insurance Co., 337 U.S. 254, 69 S.Ct. 1067, 93 L.Ed. 1347 (1949); Baltimore Contractors, Inc. v. Bodinger, 348 U.S. 176 (1955). In *Enelow* and *Ettleson* it was held that where the plaintiff's action was one originally cognizable in law, a procedural motion deciding that defendant's equitable defenses should be tried first was held to be an appealable order under section 1292(a)(1)'s predecessor. On the other hand, in *City of Morgantown* and *Baltimore Contractors* it was held that when the plaintiff's action was one cognizable in equity and the defendant's counterclaim was either one in law (*City of Morgantown*) or one in equity (*Baltimore Contractors*), the trial court's decision as to the order of the proceedings was interlocutory in form and substance and *was not appealable under* section 1292(a)(1). Of course, the importance of these decisions, as a practical matter, has been undercut by Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959), and its progeny. However, these cases do give some indication of the meaningless distinctions which continue to be given some currency in this area of the law.

**27.** In Baltimore Contractors, Inc. v. Bodinger, 348 U.S. 176, 75 S.Ct. 249, 99 L.Ed. 233 (1955), the Supreme Court discussed in some detail the legislative history of section 1292. Specifically, the Court discussed the fundamental policy determinations underlying the statute:

> The Congress is in a position to weigh the competing interests of the dockets of the trial and appellate courts, to consider the practicability of savings in time and expense, and to give proper weight to the effect on litigants. When countervailing considerations arise, interested parties and *organizations become active in efforts to* modify the appellate jurisdiction. This Court, however, is not authorized to approve or declare judicial modification. It is the responsibility of all courts to see that no unauthorized extension or reduction of jurisdiction, direct or indirect, occurs in the federal systems. . . . Any such *ad hoc* decisions disorganize practice by encouraging attempts to secure or oppose appeals with the consequent waste of time and money. The choices fall in the legislative domain. They are enlargement of the allowable list of appealable interlocutory orders; abandonment of fragmentary appeals; or general allowance of such appeals in the discretion of the trial judge upon findings of need, with or without the consent or approval of the appellate court.

348 U.S. at 181–82, 75 S.Ct. at 252 (footnote omitted).

District Court denied certification of a class action under Rule 23, Federal Rules of Civil Procedure, a quite distinguishable action. As a result, appellants have failed to bring the order within the only arguably relevant exception to the final judgment rule, 28 U.S.C. § 1292(a)(1).

The appeal must therefore be dismissed.

Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVEN-THAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges.

### ORDER

PER CURIAM.

It appearing that appellants' suggestion for rehearing *en banc* and amicus curiae's suggestion for rehearing *en banc* having been transmitted to the full Court and there not being a majority of the Judges in regular active service in favor of having this case reheard *en banc*, it is

Ordered by the Court *en banc* that the aforesaid suggestions for rehearing *en banc* are denied.

Statement of Circuit Judge SPOTTS-WOOD W. ROBINSON, III, with whom Chief Judge BAZELON and Circuit Judges J. SKELLY WRIGHT and LE-VENTHAL join, as to why they would grant rehearing *en banc*.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

It is hardly necessary in this age to argue the worth of the class action in our ever-expanding system or jurisprudence.

Over the years it has promoted the convenience of courts and parties infinitely, reduced the expense of lawsuits incalculably, and the contributed immeasurably to efficient judicial administration. It has, too, made its mark on the development of the law. The reports are dotted with landmark cases which without benefit of representative litigation would never have seen the light of day.

Even more profoundly, the class action has provided access to the judicial process for those who need it most. It has been the refuge of the poor, the hope of the downtrodden, and the salvation of the many whom our social institutions all too frequently victimize, unwittingly or otherwise. Truly it is said that "[t]he class action is one of the few legal remedies the small claimant has against those who command the status quo." [1]

In sum, as two leading authorities have aptly observed, "[i]t now is apparent that the increasing complexity and urbanization of modern American society has tremendously magnified the importance of the class action as a procedural device for resolving disputes affecting numerous people." [2] And since class-action litigation could be chilled by nonappealability of denials of certifications save in narrowly limited circumstances, it is highly important to ascertain whether the panel's decision to that effect is correct. [3] The importance of the question is underscored by the number of decisions it has generated in other circuits, and the difficulty of the problems by the conflict of opinion which plagues them. [4]

---

1. Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 186, 94 S.Ct. 2140, 2156, 40 L.Ed.2d 732, 748 (1974) (Douglas, J. dissenting).

2. 7 C. Wright & A. Miller, Federal Practice § 1751, at 510 (1972).

3. Rehearing *en banc* is warranted "when the proceeding involves a question of exceptional importance." Fed.R.App.P. 35(a)(2).

4. *See* Yaffee v. Powers, 454 F.2d 1362, 1364–1365 (1st Cir. 1972); Caceres v. International Air Transport Ass'n, 422 F.2d 141, 142–144 (2d Cir. 1970); City of New York v. International Pipe and Ceramics Corp., 410 F.2d 295, 298–299 (2d Cir. 1969); Rodgers v. United States Steel Corp., 508 F.2d 152, 159–161 (3d Cir. 1975); Hackett v. General Host Corp., 455 F.2d 618, 621–626 (3d Cir.), cert. denied, 407 U.S. 925, 92 S.Ct. 2460, 32 L.Ed.2d 812 (1972); Brunson v. Board of Trustees, 311 F.2d 107, 108–109 (4th Cir. 1962), cert. denied, 373 U.S. 933, 83 S.Ct. 1538, 10 L.Ed.2d 690 (1963); Lamarche v. Sunbeam Television Corp., 446 F.2d 880 (5th Cir. 1971); Siebert v. Great Northern Dev. Co., 494 F.2d 510, 511 (5th Cir. 1974); Walsh v. City of Detroit, 412 F.2d 226, 227 (6th Cir. 1969); King v. Kansas City Southern Indus., 479 F.2d 1259, 1260 (7th Cir. 1973); Thill Sec. Corp. v. New York Stock Exchange, 469 F.2d 14, 15–17 (7th Cir. 1972); Price v. Lucky Stores, 501 F.2d 1177, 1179 (9th Cir. 1974); Gerstle v. Continental Airlines, 466 F.2d 1374, 1377 (10th Cir. 1972).

**372**

I would, accordingly, grant rehearing of this case *en banc*. That is not necessarily to say that the panel reached the wrong result. It is to say, however, that in my view the matter calls for consideration and decision by the full court.