James C. ROGERS, Plaintiff,

v.

Cecil C. McCALL, Defendant.

Civ. A. No. 78-1134.

United States District Court,
District of Columbia.

March 20, 1980.

Edward H. Passman, Washington, D. C., for plaintiff.

John Polk, Asst. U. S. Atty., Washington, D. C., for defendant.

MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

The plaintiff, James C. Rogers, a white male, asserts that his employer, the United States Parole Commission (Commission) discriminated against him because of his sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended, when he was not promoted, noncompetitively, to the position of Correctional Treatment Specialist GS–12 and a white female employee, Linda J. Wines, received such a promotion.

Other supervisory practices are also alleged to be unlawful, retaliatory/reprisal actions for his filing an administrative Equal Employment Opportunity (EEO) complaint and the instant action.

He seeks promotion to the GS–12 level, retroactive to June 19, 1977, a promotion to the GS–13 level retroactive to November 1979, past appropriate pay and other benefits he would have been entitled to had his promotions been timely granted, permanent assignment to the Washington, D. C. Office of the Commission, attorney's fees and costs.

Plaintiff's annual performance ratings for 1976–77, 1977–78, and 1978–79 have each been overall satisfactory although the quality of the work was rated marginal.

Effective November 1979 the plaintiff was temporarily detailed to Washington, D. C., pursuant to an agreement with the Commission and is now on reserve duty until June 1980. He has not been promoted.

The Commission denies either discriminatory or reprisal actions, contending that plaintiff's allegations are totally unfounded and that he has not even succeeded in presenting a *prima facie* case of sex discrimination. The Court agrees.

Rogers received his M.A. degree in 1972, majoring in criminology and corrections, and was hired that year as a Correctional Treatment Specialist, GS–9, by the United States Bureau of Prisons, assigned to the Federal Correctional Institution, Ashland, Kentucky. He was promoted to GS–11 on May 27, 1973. Three years later, at his request, he laterally transferred to the United States Parole Commission, Northeast Regional Office (NERO), Philadelphia, Pennsylvania, as a GS–11/3 Correctional Treatment Specialist (case analyst) effective April 19, 1976.

James A. Fife, formerly the Chairman's Executive Assistant, had discussed the position with Rogers, advising that the Commission was a growing organization with the normal progression for a case analyst from GS–11 to the less supervised GS–12 and subsequently to an examinership at the GS–13 level which plaintiff hoped, but was not promised, would be forthcoming within three years. Plaintiff erroneously equates his failure to receive promotions as timely as *he* predicted to a breach of contract by the Commission. The Commission's policy then suggested that an individual be fully qualified and able to perform in both capacities as pre-release and post-release analyst before promotion to GS–12. For a time personnel incorrectly understood that a minimum one year's experience with the Commission was required for promotion. *Infra*, p. 10.

Assigned as a pre-release analyst, plaintiff was initially one of two case analysts at NERO. In August 1976 the other became an examiner; shortly thereafter, David O'Connor transferred from the California Regional Office assuming post-release responsibility in which he was already experienced.

Linda J. Wines (now Marble) was hired by the Chairman of the Commission through the headquarters personnel staff, as a Correctional Treatment Specialist, GS–11, and in October 1976 accepted a lateral transfer to Washington, D.C., as a GS–11/12 from her previous position as Correctional Officer with the Bureau of Prisons at Morgantown, West Virginia. In November of that year she was relocated to NERO where, for the first time, three case analysts would serve simultaneously and where Frank C. Johnston, Administrative Hearing Examiner, the immediate supervisor of the Correctional Treatment Special-

ists, administratively managed NERO on a day-to-day basis.

It is plaintiff's contention that a pattern of disparate treatment then commenced in favor of Ms. Wines and persisted thereafter, to his detriment. He complains that she assumed his duties as a pre-release analyst shortly after her arrival in NERO and that he was further deposed when she was assigned his office space while he was placed in a training ("floater") position without his own office, secretary, or telephone. Despite his seniority he was subsequently moved several times to different office space. He further asserts that Mr. Johnston lunched regularly with Ms. Wines, addressing her by the improbable nickname "Wino," and assisted her in locating an area in which she might wish to seek an apartment. The plaintiff felt that Mr. Johnston gave less criticism to Ms. Wines' work than to his and allowed her to socialize with personnel during office hours, a practice neither followed nor approved by plaintiff. Although Rogers denies he inferred a romantic relationship between the female case analyst and supervisor, the implications of his references leave no doubt of his beliefs. This fallacious assumption tormented and directed his aspersions against Ms. Wines for virtually all criticism thereafter levelled toward him, direct, indirect, or imagined. Whatever went awry in plaintiff's life was attributed to Ms. Wines, "not one of my favorite people . . . . I felt that I was not now Mr. Johnston's favorite employee or friend; . . . I had had a very close relationship with Mr. Johnston prior to this."

Consider the testimony, wholly persuasive, as defendant effectively rebutted all contentions concerning preferential treatment at NERO, invalidating Rogers' sweeping allegations of sex discrimination.

Ms. Wines was hired by the Commission's then Chairman, not by or at the importuning of Mr. Johnston. The nine months' period during which plaintiff was a "floa-

ter," (necessitated to produce timely work and to prepare him for advancement by training in both pre- and post-release phases), performing backup duties for both pre- and post-release sections, and thereafter when rotation of duties occasioned reassignment of plaintiff to the post-release section, coincided with a highly disruptive expansion of the office space. That office space, not assigned on the basis of seniority, followed the assignment and work flow. As appropriate, Ms. Wines was allocated Rogers' office when assigned his pre-release function early after her arrival at NERO. Once the office renovations were completed [1] each of the analysts, none of whom had a personal secretary or clerk-typist, had his/her individual office coordinated to that person's function. Although Mr. Johnston lunched regularly with Ms. Wines, and others, plaintiff was not excluded from their company. He simply did not ask to join them, nor was he invited to do so. The friendly, concerned supervisor, responsible for the successful daily operation of his office, had a penchant for nicknames: not only was Ms. Wines addressed as "Wino" but the appellation "Jim Boy" was bestowed on the plaintiff; similar terms for other personnel also abounded. When plaintiff and Ms. Wines each initially arrived at NERO and made similar inquiry as to housing prospects, Mr. Johnston directed them—in identical manner—to the general area of an apartment complex.

It is striking to examine the extraordinary similarity of behavior exhibited by Mr. Johnston and others at NERO to plaintiff and Ms. Wines; in other instances it was *plaintiff* who received preferential treatment because of his demonstrated greater needs. It is evident, beyond any doubt, that Rogers, unquestionably an earnest, conscientious, dedicated worker, nonetheless lacked confidence in his own decision-making [an essential ingredient of his position] necessitating superior guidance and more reinforcement of his analyses than that re-

---

1. Space accommodations were incorporated in the overall office changes to meet the needs of NERO's three case analysts. The GS-14 hearing examiners were also without individual offices during this transition.

quired by the other two case analysts. The plaintiff had been encouraged to approach Mr. Johnston with problems and took exceptional advantage of the offer, not infrequently conferring with his supervisor three to four times daily. This, of course, promoted in turn additional supervision by Mr. Johnston who spent far more substantial periods of time with plaintiff than with the other analysts, assisting him in isolating the issues, coping with his other problems (some personal), and providing general reassurance. The plaintiff's dependence on consultation, which so outstripped the other analysts (O'Connor and Wines), was confirmed by NERO's Regional Attorney.[2]

On or about March 25, 1977, plaintiff received his annual performance rating which, like the other analysts, was "satisfactory," although enumerating for Rogers, a majority of below average rating factors. Ms. Wines and Mr. O'Connor were also dissatisfied with some of the specific comments on their respective ratings. Notwithstanding their performance appraisals Mr. Johnston recommended to Commissioner Joseph A. Nardoza,[3] who concurred, that each analyst be promoted to noncompetitive GS–12 positions to give each equal opportunity to become the senior analyst, a supervisory position then under discussion.[4]

Following substantial preparations for his office's participation in the May 1977 Chief United States Probation Officers' Conference, a matter recognized to be of vast importance to the Commissioner, which included individual addresses by Rogers and O'Connor, Commissioner Nardoza curtailed a portion of that conference due to his concern for a "medical emergency" he believed had befallen O'Connor. Even though

Rogers acted in good faith to his fellow analyst when he deceived the Commissioner by portraying O'Connor's bout of "stage fright" as a probable recurrence of a previous illness, his poor judgment under stress resulted in an abbreviation to both NERO and the conference of the valuable informal interchange programmed to follow the formal session.

The Commissioner's severe consternation at the incident was readily discernible even years later in the retelling at trial. He could not understand either why the plaintiff elected to deliberately deceive him by "conspiracy" with his peer to the employer's disadvantage or why Rogers did not attempt to justify his action even after O'Connor confessed the truth.

On June 3, O'Connor had his evaluation conference and was notified he would not be promoted.[5]

Three days later, plaintiff's evaluation conference was held with Commissioner Nardoza and Mr. Johnston. "Frightened," plaintiff discussed his inability to comprehend why, in light of the evaluation, he had been nonetheless recommended for promotion. His superiors were understandably mystified by the persistent questioning of their affirmative decision; plaintiff had been recommended for promotion, not demotion. Spontaneously comparing his present situation with past episodic career difficulties and totally unable to regain composure, plaintiff openly sobbed for nearly two hours. The conference was not productive and had to be terminated.

On June 7, 1977, plaintiff was advised by Commissioner Nardoza that the recommendation for his promotion to GS–12 was being withdrawn due to surging concern

---

**2.** Unlike the Regional Attorney's experience of consulting once monthly with the other analysts, the plaintiff would request his advice twice daily. Legal consultations were minimal; Rogers sought procedural and judgmental advice.

**3.** Regional Commissioner, U.S. Parole Commission, Northeast Regional Office (NERO).

**4.** Commissioner Nardoza, although recognizing plaintiff to be "the weakest of the three ana-

lysts, lacking some emotional stability and supervisory ability," nevertheless wanted him also to have the opportunity to competitively participate towards the then anticipated senior analyst position, one which never materialized.

**5.** Subsequently O'Connor filed a "grievance," discussed the matter informally with the new Chairman, was promoted to GS–12 in February 1978, and left the Commission the following month.

about his instability [6] manifested by uncontrolled weeping at the meeting the day earlier, coupled with Commissioner Nardozo's obviously shaken trust in Rogers' loyalty since the misrepresentation at the conference some weeks earlier.

■ Although the matter concerning the conference might not be evaluated by all similarly or as significantly, it nevertheless is the unquestioned prerogative of the business executive to cast his office judgments in the manner appropriate to his style of office management.[7] Provided that these judgments are applied in the absence of discrimination, they cannot then be deemed wanting in a case founded on (sex) discrimination allegations.

At trial, and particularly unexpected (he was plaintiff's witness), O'Connor testified that although there was "the appearance of this preferential treatment, Johnston was not helping Ms. Wines preferentially." Neither was his own 1977 performance evaluation attributable to sex discrimination, "nor do I feel that the withdrawal of the recommendation for Jim (plaintiff Rogers) was because of sex."

Subsequently, on June 9, Ms. Wines was promoted to a GS–12 Correctional Treatment Specialist position (pursuant to the March recommendation) after having served eight months at NERO, having had primary experience as a pre-release analyst and some less extensive experience as a post-release analyst through months of "floater" activities. At that time she had one year's activity in her grade and was not alone in her promotion in less than one year.

The Commission had hired six case managers from the U.S. Bureau of Prisons and the District of Columbia Department of Corrections during 1976, five males and one,

Ms. Wines, a female. Training at headquarters was provided to Ms. Wines and to two of the males due to the availability of funds when they were hired and the fact that they started work almost simultaneously. Male analysts James Kelly and Gary Lasley were also promoted within one year.

Although acknowledging that Ms. Wines was "quite a capable analyst, a very good analyst," who had successfully undertaken the additional responsibility to reduce to currency the mounting Privacy Act backlog and who was "also faster than O'Connor and me," the plaintiff vacillated when claiming the Wines' promotion as his foundation of sex discrimination. He testified, at some point, that the female's promotion equated to sex discrimination despite its *non* competitive status since, he argued, she was "not entitled to [promotion] under the earlier ground rules of one year in the Commission even though she was doing GS–12 work; it was discriminatory that she and the other analysts would all receive promotions at the same time when I had one year experience with the Commission and had learned both pre-release and post-release and she did not." Later, inconsistently, the plaintiff testified that "this action [Wines' promotion] in and of itself does not represent sex discrimination . . . . It was not sex discrimination when my promotion recommendation was withdrawn but I was not satisfied with the explanation. I did deserve to be promoted."

■ Although "[t]he facts necessarily will vary in Title VII cases, and the specification . . . of the *prima facie* proof required from [plaintiff] is not necessarily applicable in every respect to differing factual situations," *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), it is clear that a Title

6. Promotion to GS–12 would set in process eligibility for the position of GS–13 Examiner where the work stress became substantially greater, particularly in common situations of face-to-face confrontation with prisoners anxiously promoting the examiner's possible recommendation of release.

7. The Commissioner, taking a distinct interest in his employees' performance and generous with his own time and constructive suggestions, expected to receive an appropriate response to his exacting requirements, as example, when his personal secretary did not punctually attend a meeting she instantly became the recipient of a written reprimand.

VII plaintiff carries the initial burden of showing actions taken by the employer from which it can be inferred that it is more likely than not that such actions were "based on the discriminatory criterion illegal under the Act." *International Brotherhood of Teamsters v. U. S.*, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977). In short, plaintiff Rogers must demonstrate a *prima facie* case of discrimination (sex) by a preponderance of the evidence that he did not receive his promotion due to disparate treatment afforded to a female, customarily, in comparable situation.

The nucleus of inquiry centers on whether the employer is treating "[this person] less favorably than others because of [his] race, color, religion, sex, or national origin." *International Brotherhood of Teamsters,* 431 U.S. at 335 n.15, 97 S.Ct. at 1854 n.15.

■ This causal connection may be proved by demonstrating "disparate treatment," defined by the Supreme Court:

[A] "disparate treatment" . . . is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, although, it can in some situations be inferred from the mere fact of differences in treatment. [citation omitted] Undoubtedly disparate treatment was the most obvious evil Congress had in mind when it enacted Title VII. *Id.*

See, *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).

■ Disparate treatment is usually illuminated by the use of comparative evidence. It is not unlawful for example to treat persons unfairly, if all persons are similarly treated, *see, e. g., Morita v. Southern Cal. Permanente Medical Group,* 541 F.2d 217, 218–20 (9th Cir. 1976), *cert. denied,* 429 U.S. 1050, 97 S.Ct. 761, 50 L.Ed.2d 765 (1977). The Act simply and clearly proscribes *all* discrimination in employment.

■ Although an employer has an unquestioned right to consider all the facts, determine the measure of action (e. g. punishment, demotion, failure to promote) and indeed terminate an employee for "good reason, bad reason or no reason [at all] absent discrimination," *Harper v. TWA,* 385 F.Supp. 1001, 1004 (E.D.Mo.1974), *aff'd,* 525 F.2d 409 (8th Cir. 1975); *Tims v. Board of Education of McNeil, Arkansas,* 452 F.2d 551, 552 (8th Cir. 1971), where the same employee misconduct exists, the penalty must be applied without discrimination, *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976). *See also, Bishop v. Wood,* 426 U.S. 341, 349–50, 96 S.Ct. 2074, 2079–80, 48 L.Ed.2d 684 (1976).

■ A *prima facie* case under *McDonnell Douglas* examines the matter sensibly, with common experience, in a nonritualistic way, to locate an inference of discrimination. When the legitimate reasons for activity or passivity are eliminated as possible reasons, then, as in *Furnco,* "it is more likely than not the employer whom we generally assume acts only with *some* reason, based his decision on an impermissible consideration . . . ." The employer, given this realm of proof with the shifted burden, need merely introduce evidence which bears on his motive, articulating that he bottomed his employment decision on "some legitimate nondiscriminatory reason for the employee's [rejection]", *McDonnell Douglas, supra,* 411 U.S. at 802, 93 S.Ct. at 1824.

*Furnco* refined the order of proof propounded in *McDonnell* making it clear that despite proof of a justification reasonably related to the advancement of an acceptable purpose, the employer's motives are exposed to a continued critical scrutiny. Were the employer's stated practices seemingly reasonable but in reality a cloak for discrimination? The opportunity then returns to the employee to produce evidence that the proffered justification was merely a pretext for discrimination.

■ Although the failure to promote might, at first examination, seem unduly

harsh it is not for the Court to decide whether another reasonable person might, on reflection, have come to a different management conclusion. The issue here is whether *discrimination* occurred and, if so, whether that discrimination was as a result of the plaintiff's sex. Absent discrimination, the choice of personnel advancement by promotion is a matter left to the employer's best business judgment in light of all considerations.

Without question ambiguous personnel interpretations and administrative confusion existed concerning regulations administered by three successive chairmen in as many years and, in particular, (1) whether one could be promoted with less than one year in grade or one year with the Commission and (2) whether analyst proficiency was required in both pre- and post-release functions or only in the disjunctive.

It is obvious in the illumination of this matter that Ms. Wines' promotion to this noncompetitive position in no way diminished or increased the eligibility or opportunity of Mr. Rogers for promotion. It is wholly unpersuasive therefore that her promotion without significant post-release experience after a period of less than one year of service constituted unlawful sex discrimination. Unlike Ms. Wines, who had not exhibited such behavior, Mr. Rogers' integrity, or, at minimum, judgment under stress, had been gravely questioned as a result of the conference incident.

His inexplicable prolonged sobbing and comments on the occasion of his performance evaluation (despite which evaluation promotion had already been recommended), when a substantially different reaction could be anticipated, magnified past instances of less egregious but still inappropriate tearful responses.

It is hardly surprising then to find the employer's focus sharpened on whether Rogers possessed sufficient emotional stability to perform advanced professional responsibilities. No one even attempts to assert that Ms. Wines behaved comparably. On the contrary, in comparison to Ms. Wines, the evidence demonstrated, abundantly, that Rogers worked more slowly, with less accuracy, less responsively to training, needed more assistance from his superiors and was far less competent to work independently.

■ Although plaintiff remains the sole GS–11 Correctional Treatment Specialist in the United States Parole Commission not ultimately promoted to GS–12, the record remains devoid of any evidence concerning preferential, discriminatory, or disparate treatment based on sex or any other factor favoring Linda Wines' noncompetitive promotion to GS–12 over the other analysts in the office.

■ The Court concludes that the plaintiff has failed to establish even a *prima facie* case that his failure to gain promotion rested on the impermissible basis of sex discrimination. Even had a *prima facie* case been established, the Commissioner's decision to withdraw the promotion was substantiated and justified; plaintiff's failure to secure advancement was due to legitimate cause, untainted by any discriminatory practice.

Following Ms. Wines' promotion and apologizing for any previous doubts as to their actions, plaintiff wrote Commissioner Nardoza on July 8 that "[a]fter a series of long talks with Mr. Johnston my concerns were answered."

Despite this, seven weeks later, dissatisfied with his subsequent interaction with the Commissioner, plaintiff advised James A. Fife, U.S. Parole Commission EEO coordinator, of his intention to file an EEO complaint of sex discrimination against his regional supervisors, and requested the services of a counsellor to resolve his problems informally. Fife notified Chairman McCall of this, the Commission's first discrimination complaint, but did not notify Commissioner Nardoza or Mr. Johnston (then on leave). Later, Rogers filed a formal complaint.

Rogers contends that he has been subject to retaliation for having engaged in protected activity in violation of § 704(a) of

Title VII, 42 U.S.C. § 2000e–3(a),[8] which recognizes two different matters: "opposition" and "participation."

The primary source of protection against retaliation for those who oppose actual or suggested discrimination or who participate in Title VII processes is section 704(a) which has been construed broadly to prohibit "discrimination against applicants or employees attempting to protest or correct allegedly discriminatory conditions of employment." *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 796, 93 S.Ct. 1817, 1821, 36 L.Ed.2d 668 (1973).

██ Rogers' action in filing an EEO complaint was plainly within the ambit of 704(a), there being no doubt that the intention of Congress was to protect the employee who utilized its legislative tools. "The Act will be frustrated if the employer may unilaterally determine the truth or falsity of charges and take independent action." *Pettway v. American Cast Iron Pipe Co.,* 411 F.2d 998, 1005 (5th Cir. 1969); *see also, Mitchell v. Mid-Continent Spring Co. of Kentucky,* 583 F.2d 275 (6th Cir.), *rehearing denied,* 587 F.2d 841 (1978).

██ It would be intolerable to punish an employee for invocation of the very Act which is his protective armor.

As the Supreme Court said in *NLRB v. Burnup and Sims, Inc.,* 379 U.S. 21, 23, 85 S.Ct. 171, 172, 13 L.Ed.2d 1 (1964).

A protected activity acquires a precarious status if innocent employees can be discharged while engaging in it, even though the employee acts in good faith.

██ To establish a violation of 704(a) Rogers need not prove that the underlying claim for discrimination was true. *Sutton v. National Distillers' Products Co.,* 445 F.Supp. 1319, 1327 (S.D.Ohio 1978); *United States v. University of Maryland,* 438 F.Supp. 742 (D.Md.1977).

It is acknowledged that retaliatory adverse treatment can take many shapes and guises but normally consists of harassment, disciplinary action, overbearing surveillance of the protesting employer's work performance, deprivation in participatory activities or denial of benefits which the employee would otherwise have received. Other forms of cognizable adverse treatment include giving a poor recommendation to a former employee in retaliation for the employee's institution of an EEOC charge, *Rutherford v. American Bank of Commerce,* 565 F.2d 1162 (10th Cir. 1977), or failing to provide a letter of recommendation, *Pantchenko v. C. B. Dodge Co.,* 581 F.2d 1052 (2nd Cir. 1978), removing or changing various duties for an employee, demotion, and giving adverse evaluations.

A plaintiff in asserting reprisal confronts immediately the *McDonnell Douglas v. Green* burden of proof considerations. A *prima facie* case of retaliation must be established. Thereafter the defendant must emerge with a legitimate, nondiscriminatory explanation for his conduct. Should the defendant's articulation be successful, then the plaintiff must demonstrate the proper nondiscriminatory reason for the action was "in fact pretext."

██ To establish a *prima facie* case of retaliation, it must be shown: (1) that the plaintiff is either engaged in opposition to Title VII discrimination or participated in a Title VII proceeding; (2) that the plaintiff received adverse treatment from the employer either contemporaneous with or after the opposition or participation; and (3) that there is evidence of a causal connection between the basis and the issue, that is, that a retaliatory motive played a part in

---

8. Section 704(a) of Title VII, 42 U.S.C. § 2000e–3(a) provides:

(a) It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

the adverse treatment, which among other matters, requires a showing that the employer had actual or imputed knowledge of the opposition or participation.

Plaintiff has set forth a series of allegations of harassment and reprisal/unlawful retaliation on the part of his NERO supervisors. Two incidents purportedly predated the earliest time [September 7, 1977] Commissioner Nardoza knew of the informal complaint [the formal complaint was filed September 26, 1977] and incidents too numerous to recite individually here, are alleged to have succeeded that date. A few instances will be illustrative.

In August 1977 plaintiff was assigned to work on a particularly sensitive publicized case demanding a prompt Commission decision. He departed for a previously approved medical appointment without reminding personnel of this fact, but leaving his analysis and recommendation in the Commissioner's Office. The necessity to recall him for consultation was unfulfilled by lack of knowledge as to where he could be located. On September 1, 1977, at his first administrative staff meeting, a veiled but not exceptional reference was made about plaintiff when, among other matters, Commissioner Nardoza reminded his employees of the taking and reporting of sick leave.

On September 7 when plaintiff first notified Commissioner Nardoza of the EEO complaint, the Commissioner was "surprised [and] deeply irritated", advised Rogers he could no longer informally discuss the case since Rogers did not want a settlement, had refused to discuss the matter, and had said he was charging the Commissioner with "violation of federal ethics." It would be strained indeed to find this attitude an act of reprisal.

At a staff meeting on September 20, plaintiff stated that office morale was suffering due to "frightened employees" whom he refused to identify until consultation with his EEO counsellor; still later he re-

fused to respond to Nardoza's follow-up memo seeking specific information about the "frightened, demoralized employees" at NERO. Plaintiff viewed this inquiry as "badgering and a reprisal action." The demoralization, it soon became evident, was the result of plaintiff's own actions, among which was plaintiff's offensively reckless characterization of a supervisor's gentle pat on a female employee's shoulder as a "laying on of hands." [9]

Plaintiff has testified lengthily as to various other matters he considered of moment. It is difficult to know when Rogers still asserts "reprisal" since he continuously changed his opinion of certain actions either from "retaliation to non-retaliation" or from "non-retaliation" to "retaliation" throughout the trial. Some he initially believed to be innocent but subsequently decided they "had to be reprisals" since his decision that even the slightest criticism or non-inclusion in an activity following the filed EEO complaint "must constitute reprisal, not having occurred before the filing." As to others, first he would testify they were "reprisals"; later, he would state he did not consider those incidents retaliatory actions. A certain training session, for example, he termed variously as: "harassment", "reprisal", "useful", "helpful", "welcome but not needed."

■ It becomes inappropriate and unnecessary to delve further into the labyrinth of the remaining charges and counter charges. Plaintiff himself is unable to recall how many reprisal, actions were filed, how many actions were considered reprisal, and how many are yet pending departmental decision. Suffice it to note that all plaintiff wished to explore has been fully ventilated, scrutinized on the record, considered thoroughly and in the ultimate allows one conclusion: not one instance of reprisal/retaliation has been demonstrated.

As also with the underlying charge of discrimination in this matter the Court is

---

**9.** Plaintiff not only disapproved of Ms. Wines' socializing with office employees but constantly faulted actions relating to other female employees, such as the reinstatement of one fol-
lowing birth of a child, to such extent that he tried to secure that employee's personnel file in his fruitless search for some impropriety.

unable here to find even a *prima facie* case of retaliation. The defendant has forthrightly demolished the plaintiff's allegations of reprisal one by one, with overwhelming credible evidence justifying the employer's activities.

It is, accordingly, the Court's conclusion that matters raised by plaintiff Rogers were not steps taken to harass, intimidate, humiliate, or retaliate against him for filing an EEO complaint or instituting and pursuing the instant action.

In sum, plaintiff has not proven that defendant violated Title VII of the Civil Rights Act of 1964, as amended, either as to sex discrimination or subsequent retaliatory actions resulting in adverse treatment.

Plaintiff himself, laboring under the burden of his extraordinary sensitivities, has generated his own fate, bringing swift and continuing blows to his promotional endeavors.

Judgment shall be entered in favor of the defendant and plaintiff's complaint dismissed.

An order consistent with the foregoing has been entered this date.