Henry W. **SEGAR, et al., Plaintiffs,**

v.

Benjamin R. **CIVILETTI, et al., Defendants.**

Civ. A. No. 77–0081.

United States District Court, District of Columbia.

May 5, 1981.

---

**MEMORANDUM OPINION**

AUBREY E. ROBINSON, Jr., District Judge.

Before the Court is Plaintiff Carl L. Jackson's *Motion for a Preliminary Injunction* in this Title VII, 42 U.S.C. § 2000e *et seq.*, litigation. Jackson is the highest ranking Black agent in the Drug Enforcement Administration (DEA).[1] On February 24, 1981, Jackson was demoted from his GS–16 position as Deputy Regional Director (DRD) of DEA's Northeast Regional Office, (NERO) and transferred to the Dallas, Texas Regional Office to become a GS–15 Special Projects Officer. Jackson alleges that this transfer and demotion is an act of reprisal in violation of Title VII, 42 U.S.C. § 2000e–3(a). A hearing on this Motion was held on April 9, 1981. This Court's findings of Fact, for the purposes of this Motion, may be summarized as follows:

In early 1977, Black Special Agents filed this litigation as a class action, alleging numerous Title VII violations.[2] In October of 1978 DEA was reorganized,[3] and Plaintiff became Special Agent In Charge (SAIC) in New York.[4] Trial of this case commenced on April 9, 1979, and concluded on April 24, 1979.[5] Jackson, a member of the class, testified on April 10, 1979, and April 24, 1979.

Jackson's testimony on April 10, 1979, supported numerous claims of discrimination. Two salient portions of his testimony are relevant to this proceeding however, to wit: (1) his assertion that DEA Administrator Bensinger was not concerned about equal opportunity in employment, and (2) his fear of reprisal for the testimony he gave. Some of this testimony is summarized below.[6] Jackson's testimony on April

William T. Lake, Judith Barry Wish, Wilmer, Cutler & Pickering, Washington, D. C., for plaintiffs.

Robert Seldon, Asst. U. S. Atty., Washington, D. C., for defendants.

---

1. For a detailed description of DEA's structure, see this Court's Findings in *Segar v. Civiletti*, 508 F.Supp. 690 at 693–695 (D.D.C.1981).

2. *Id.*, at 692–693.

3. Plaintiffs did not allege that the reorganization violated Title VII. For a summary of the effects of the reorganization, *see Segar v. Civiletti*, at 708–710.

4. The New York Office (NYO) is part of NERO. The SAIC manages the New York Office, and reports to NERO's second in command, the Deputy Regional Director (DRD). The DRD reports to the Regional Director (RD).

5. *Id.* at 692.

6. "I think that the position that I [and other high ranking Black officials are in now] ... I consider these positions token. I think at the reorganization Mr. Bensinger had a golden opportunity to really do something about this [equal opportunity] problem. As a matter of

24, 1979, primarily concerned an unannounced inspection of the New York Office that had occurred in January of 1979. Jackson testified, *inter alia*, that the inspection was accurate, but that it did not reflect upon his abilities as NYO's SAIC.[7]

One day later, on April 25, 1979, Jackson received a reprimand from NERO DRD Nicholas Panella, which was concurred in by the NERO RD John Fallon. Jackson was reprimanded as a result of the unannounced inspection the first (and only) time an SAIC has been so reprimanded.[8] On April 30, 1979, Jackson received a "marginal" performance rating, the only time in his twenty-one (21) year career at DEA he has been adjudged less than "fully satisfactory."[9] As a result of these two actions, Jackson filed an informal EEO complaint charging, *inter alia*, that they were the product of retaliation for his testimony in *Segar*. Since neither Fallon nor Panella evidenced any interest in negotiating a resolution of the complaint, Jackson filed a formal EEO complaint on August 27, 1979.

In the spring of 1979 Jackson met with Marion V. Hambrick, Assistant Administrator for Enforcement of DEA. Hambrick told Jackson that Bensinger was (1) concerned that Jackson was too involved in EEO, and (2) displeased with his testimony at the *Segar* trial. He then told Jackson that he'd better "watch it." Jackson told Hambrick that he would try to do that, but that he was having problems with NERO RD John Fallon. Jackson said he didn't understand why Headquarters didn't "do something" about Fallon. Hambrick responded that Headquarters was "supportive" of Jackson's position vis-a-vis Fallon, and the NYO's statistics were improving, and that Jackson should be careful, just do his job, and watch himself.

In July of 1979 Jackson met with Bensinger to discuss the problems Jackson was having with Fallon. Jackson felt that Fallon was trying to downgrade the efforts of the New York Office, and that he was neither trustworthy nor honest. Bensinger asked Jackson what he wanted done about the problem, and Jackson suggested that Bensinger have an independent study of the problem.

As a result of this meeting in August of 1979 Bensinger ordered an unannounced evaluation of NERO. This evaluation revealed, *inter alia*, (1) factionalism in the management core of the New York Office, and (2) the shortcomings of NERO RD John

---

fact, he had the Percy Amendment ... He chose not to do this ... Mr. Bensinger has had the opportunity to move in this direction [equal opportunity] if he wanted to, if he was committed. (Tr. 211).

"Mr. Bensinger is very good on rhetoric. As a matter of fact, he was very accommodating in his speech, talked about things he was going to do; but I consider a commitment to be an affirmative action which is manifested by results, and I think if I don't see the results, then I have to put the commitment in the category of rhetoric and I think this is exactly what Mr. Bensinger's commitment has been. (Tr. 212–213).

"I think he [Bensinger] should have placed—and I think we do have some very able Blacks, and I include myself in that group—into those positions where policy could be affected, because that's the problem: there are no Blacks in policy-making positions. Mr. Bensinger knew that at the outset of the reorganization and he never attempted to do anything. (Tr. 239).

"There is going to be some [retaliation] as a result of my testimony here, I am sure. (Tr. 205)."

7. Unannounced inspections are normal at DEA, and Jackson attached no significance to the inspection's occurrence. He testified, however, that the inspection covered the year 1978, that he had only been SAIC in the NYO for three months prior to the inspection, that the reorganization had thrown the Office into disarray, and that changes made both prior and subsequent to the inspection were beginning to bear fruit. Jackson stated that he did not feel he could be held accountable for the state of the NYO reflected in the unannounced inspection, and was unconcerned about it since improvements were already being reflected.

8. There is no justification for this reprimand, and the Court has already held that the disciplinary system violates Title VII. *See id.* at 700–701, 714.

9. This Court has already held that the evaluation system violates Title VII. *See id.* at 700, 714.

Fallon. The factionalism, which apparently was not the product of racial animus, caused the NYO to be divided into "two armed camps," one loyal to Jackson, the other loyal to Fallon. A third camp of neutrals was also described, although many of the neutrals had "sympathy" for Jackson.

Fallon's shortcomings were, according to the report, that his "approach to management is autocratic and sometimes almost dictatorial." Fallon's DRD was not given management responsibility, and that position "was not clearly defined." Moreover, since Fallon "was involved in all matters of consequence in New York City," the DRD's involvement with the NYO was limited. Finally, the report noted that Fallon often made decisions involving the NYO without consulting the relevant managers. Jackson testified at the hearing that he agreed with the evaluation, but that it did not go far enough. He stated that Fallon is also "a racist," a contention not disputed at the hearing.

On August 12, 1979, Jackson was promoted from GS–15 to GS–16. This promotion resulted from the October 1978 reorganization and delays associated with allocation of additional super grade [10] positions, and had been promised Jackson prior to commencement of the *Segar* trial.[11] It is therefore not probative of DEA's response to his testimony at the trial.

In December of 1979 Jackson was "promoted," effective January 27, 1980, from NYO SAIC to NERO DRD. Bensinger promoted Jackson ostensibly because (1) he was doing a good job as SAIC, (2) the DRD position should be filled with someone who has knowledge and experience within the region, and (3) the perception of factionalism might decrease if Jackson was promoted. Jackson attempted to decline the promotion, stating that he found the SAIC position challenging and that there were problems with the NERO DRD position. Jackson indicated to Bensinger that he felt there was no "longevity" in the NERO DRD position, that everyone who worked there under John Fallon had been "kicked out," that the DRD was "put in a closet" in NY and given no responsibility, and that his fate would be no different. Bensinger was insistent, however, and Jackson became DRD.

Jackson's predictions regarding the DRD position became reality. Fallon consistently bypassed Jackson when policy issues materialized; he supervised Tom Byrne, NYO's new SAIC, even though this was Jackson's responsibility, and he ordered Jackson to spend the vast majority of his time supervising the Philadelphia Regional Office. After his promotion, Jackson was removed from decision-making responsibility in the New York Office. Bensinger knew or should have known that this would occur; he was familiar with Fallon's management style, he knew that the NERO's DRD never had the responsibility given other DRDs, he was aware that Fallon often interceded in the operation of the New York Office, he knew about Jackson's pending EEO complaint, and he was cognizant of the animus that had developed between Jackson and Fallon. Nevertheless, the only response to the August management evaluation was this "promotion" of Jackson. There is no evidence of record indicating that Bensinger took any action concerning Fallon's management style, his racist attitude,[12] or his relationship with Jackson.

In Late 1979 the "Tarallo incident" occurred. The facts of that incident, which are before the Court,[13] are unimportant. Ultimately, Fallon, overriding the recommendation of Jackson, decided to severely

---

10. Super grade positions are GS–16 and above.

11. *Id.* at 710.

12. Bensinger's failure to address Fallon's racial animus is symptomatic of DEA's approach to equal employment opportunity. *Id.*, at 708.

13. *See* Plaintiff's exhibit 16, *Tarallo v. DEA*, # PH07528110009, (MSPB Jan. 27, 1981).

punish the three agents [14] involved. In December of 1980, the Merit Systems Protection Board held a hearing to determine the fairness of the punishment. Jackson was asked by the agents to testify on their behalf, and, contrary to the wishes of John Fallon and other top DEA officials, did so. The Administrative Law Judge condemned DEA for its action,[15] and the agents were vindicated.

On January 5, 1981, Jackson met with Marion Hambrick to negotiate a settlement of his EEO complaint. DEA issued a statement calling the letter of reprimand "unwarranted," and stating that it "should not have been issued." Hambrick ordered that the letter be expunged from Jackson's record, and ordered Panella to issue a new performance rating for the period April 1, 1978 to March 31, 1979. In return, Jackson dropped the EEO charge. DEA did not admit that either the letter or the evaluation resulted from discrimination. On January 19, 1981, Fallon objected to the expungement of the letter of reprimand, claiming that the reprimand was warranted.

On February 6, 1981, this Court issued its Findings of Fact and Conclusions of Law in *Segar*. In six areas, including supervisory evaluations and imposition of discipline, the Court found that discrimination existed and exists at DEA.[16] On February 9, 1981, Jackson was accused by Fallon and Hambrick, with Bensinger's acquiescence, of perjuring himself at the Tarallo hearing. This accusation involved Jackson's testimony that he had seen a transcript of the District Court proceedings, when he had not, in fact, seen that transcript. Rather, he had seen a transcript of a summary of the Court's comments at that proceeding. Jackson's misstatement was innocent—it was not intentional and it did not impact on the litigation. DEA's response was not so innocent, however. Fallon and Hambrick implied that Jackson had intentionally misled the Administrative Law Judge, and Hambrick

requested a memo from Jackson indicating whether his testimony was correct or incorrect.

On February 24, 1981, Jackson was notified that as of March 2, 1981, he was to be transferred and demoted, along with NYO SAIC Tom Byrne. Fallon was put on 6 months probation, but neither transferred nor demoted. The reasons given by Bensinger for this action are (1) the arrest record of the NYO had dropped substantially, (2) that NYO's record had never been cost-effective, (3) that management (i. e. NERO's RD and DRD and NYO's SAIC) were responsible for the poor record, (4) Fallon had excellent connections with foreign and local law enforcement officials, and (5) Fallon was currently under investigation by the FBI for alleged misuse of authority.

Bensinger's rationale for the transfer and demotion is a pretext designed to cloak retaliation against Jackson. DEA indicated during the *Segar* trial that its focus had "changed substantially," and that "[t]he agency is now aiming its efforts at network elimination rather than individual elimination."[17] In light of this assertion, it is not plausible that individual arrests would provide the basis for evaluating a management team.

Moreover, the undisputed evidence belies an assertion that Jackson could be held accountable for NYO's poor performance. It is uncontested that (1) Jackson was doing a good job as NYO's SAIC; (2) NYO's SAIC Byrne, who had primary responsibility over the management of NYO, by-passed Jackson and reported directly to Fallon; (3) Fallon directly interceded into the operations of NYO; (4) Fallon insisted that Jackson devote himself primarily to the Philadelphia Office, thus in effect precluding Jackson from exercising responsibility in NYO; and (5) Fallon's management style precluded the effective exercise of authority by DRD Jackson. Indeed, the record

---

14. All three agents are Caucasian.

15. *See Tarallo v. DEA*, at 8, 18–21.

16. *See Segar v. Civiletti*, at 705–708, 714.

17. *Id.*, at 694.

indicates that NYO's record deteriorated *after* Jackson was removed as NYO's SAIC.

It is apparent to the Court that this harassment and reprisal action epitomizes the main action. Supervisory evaluations and the imposition of discipline were unjustly employed to Jackson's detriment. This is consistent with this Court Findings.[18] Moreover, the Administrator is still unwilling to face the realities of race discrimination in the Drug Enforcement Administration.[19] Fallon's racial animus is at the root of the Jackson/Fallon adversary relationship. Yet the Administrator refused to address Fallon's racism. Indeed, he has delayed taking any action against the man primarily responsible for NYO's poor performance, and has instead demoted the highest ranking Black DEA official. This demotion, at a time when Black agents will in all likelihood have to come forward and produce evidence concerning damages,[20] can only be understood as a product of retaliation.

Mr. Jackson asks this Court to enjoin his transfer and demotion pending final adjudication of his claim of unlawful retaliation. In considering the award of preliminary injunctive relief, this Court must scrutinize four factors, namely: (1) plaintiff's likelihood of prevailing on the merits, (2) irreparable injury, (3) the effect of relief on third parties, and (4) the public interest. *WMATC v. Holiday Tours* 559 F.2d 841, 843 (D.C.Cir.1977).

## I. Likelihood of Success on the Merits

■ Jackson alleges that DEA's actions violate Section 704(a) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–3(a). This provision states, in pertinent part:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice may be an unlawful employment practice under this subchapter.

In order to establish a *prima facie* violation of this section, Plaintiff must show (1) that he protested practices contrary to Title VII, (2) that he was subject to an adverse action by his employer, and (3) that the adverse action is linked to the protected conduct. *Gunther v. County of Washington*, 602 F.2d 882, 892 (9th Cir. 1979); *Rogers v. McCall*, 488 F.Supp. 689, 697–698 (D.D.C.1980). The respective burdens of proof, persuasion, and production present in Title VII discrimination cases, *see e. g. Texas Dept. of Community Affairs v. Burdine*, —— U.S. ——, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), also apply to retaliation litigation. *Gunther v. County of Washington*, 602 F.2d at 892; *Rogers v. McCall*, 488 F.Supp. at 697.

■ Plaintiff is very likely to prevail on the merits. It is undisputed that he engaged in protected activity and was subject to adverse action. Moreover, the causal connection between them is manifestly clear. Bensinger and Hambrick knew about Jackson's testimony at the *Segar* trial and knew the substance of that testimony. Jackson was told to "watch himself" by Hambrick. Bensinger knew that Jackson and Fallon were unfriendly, and knew that Panella, with Fallon's approval, had unjustly reprimanded Jackson. Bensinger knew that individuals he had appointed had conducted an evaluation of NERO and issued a report highly critical of Fallon. Bensinger knew that Fallon could not work with Jackson, and understood that Jackson did not want to become NERO's RD. Nevertheless, he appointed Jackson to become Fallon's second in command, and then relied on the ensuing decline in productivity to demote and transfer Plaintiff. Plaintiff has made a *prima facie* showing of retaliation and has proven that Defendants' justification was a pretext for that retaliation. He has met his ultimate burdens of persuasion and proof.

---

18. *See* note 16, *supra*, and accompanying text.

19. *See* note 12, *supra*, and accompanying text.

20. While the parties are attempting to settle the damages issues there is no certainty as to whether settlement can be effectuated or what settlement would entail. In all likelihood, however, individual members of the class will have to come forward with proof of damages, regardless of the potential for settlement.

**320**

*Texas Dept. of Community Affairs v. Burdine,* —— U.S. at ——, 101 S.Ct. at 1093.

## II. Irreparable Harm

Plaintiff alleges that he and members of his class will suffer irreparable harm if the transfer and demotion are not enjoined. Only in a "genuinely extraordinary situation" in which "the circumstances surrounding the employee's discharge, together with the resultant effect on the employee . . . [radically] depart[s] from the normal situation" may irreparable injury be found. *Sampson v. Murray,* 415 U.S. 61, 92 n. 68, 94 S.Ct. 937, 953 n. 68, 39 L.Ed.2d 166 (1974). In the instant case Plaintiff would suffer no injury that could not subsequently be remedied. Neither the inconvenience caused by the transfer nor the injury to his reputation caused by the demotion would be irreversible. As the Supreme Court stated in *Sampson v. Murray,* 415 U.S. at 90, 94 S.Ct. at 952, quoting from *Virginia Petroleum Jobbers Assn. v. FPC,* 259 F.2d 921, 925 (D.C.Cir.1958):

> The key word in this consideration is *irreparable.* Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility of adequate compensatory or other corrective relief at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

Financial injury resulting from the transfer and injury to reputation resulting from the demotion can both be mitigated in the course of litigation. *See Smith v. Secretary of the Navy* No. 79–1877, (D.C.Cir. January 30, 1981), slip op. at 19.

Irreparable harm would however, attach to members of the Plaintiff class should this Court refrain from issuing the requested injunction. They must come forward with proof of specific injuries.[21] Jackson, as the highest ranking Black DEA agent, is highly visible to members of the class. His unwarranted transfer and demotion would serve as an example to the class members—know

your place, don't challenge management, don't assert your right to equal employment opportunity. The message transmitted to the class members by this act of retaliation is clear; unless Plaintiff is protected now from the adverse action, members of the class will refrain from coming forward with their claims. The injury to them will be irreparable.

## III. The Effect of Relief on Third Parties

The only third parties affected the issuance of a preliminary injunction are other members of the Plaintiff class. They will benefit from its issuance; no harm will befall others.

## IV. The Public Interest

Defendants allege that the public interest would not be served by the issuance of an injunction because the New York Office has shown signs of improvement since Jackson's removal. No documentary evidence of improvements have been presented to the Court, and the credibility of DEA's witnesses is questionable. Assuming *arguendo* that some public interest would be disserved by the issuance of a preliminary injunction, it would be more than offset by the public's interest in full vindication of the rights codified in Title VII. This interest in full vindication is accentuated by the status of Defendant as a Federal agency.

## V. Balancing the Considerations

This Court does not issue preliminary relief lightly, even when it perceives a high likelihood of success on the merits. *See North Slope Borough v. Andrus,* 486 F.Supp. 326, 330–331 (D.D.C.1979). In the instant case, however, all four factors support the issuance of a preliminary injunction. Moreover, this Court has already presided over trial in the main action. A primary reason for judicial restraint in the issuance of preliminary relief is the need for the Court to be fully informed before it injects itself into a dispute. Trial of and

deliberation over the issues presented in the main action gives the Court a much fuller view over this litigation than it would otherwise have obtained.[22] Plaintiff's request for preliminary relief must be granted.

## ORDER

Upon consideration of Plaintiff's Motion for a Preliminary Injunction, the Opposition thereto, the hearing held on April 9, 1981, the Memorandum Opinion issued this date, and the entire record herein, it is by the Court this 5th day of May, 1981

ORDERED, that Defendants be and hereby are restrained from demoting Carl L. Jackson and transferring him from his position as Deputy Regional Director of the Northeast Region of the Drug Enforcement Administration, or taking any other adverse employment action with respect to Mr. Jackson, pending a final determination by this Court on his claim of retaliation.

---

**22.** For example, it would have been difficult to evaluate the evidence presented at the hearing if the Court was unaware of DEA's structure and past practices. Likewise, if this Court was unaware of Jackson's prior testimony and credibility, resolution of the instant issue would have been more problematic.