**Joslyn N. WILLIAMS, Plaintiff,**

v.

**Daniel J. BOORSTIN, Defendant.**

**Civ. A. No. 72–1633.**

United States District Court,
District of Columbia,
Civil Division.

April 4, 1978.

**1118**

Jerry S. Cohen, Michael D. Hausfeld, Kohn, Milstein & Cohen, Washington, D. C., for plaintiff.

Earl J. Silbert, U. S. Atty., Robert N. Ford, Asst. U. S. Atty., James G. Hergen, U. S. Dept. of Justice, Washington, D. C., for defendant.

MEMORANDUM

OBERDORFER, District Judge.

Plaintiff, Joslyn N. Williams, is a leader of black employees of the Library of Congress. He brought this suit in 1972 charging that on August 11 of that year, the

Library deprived him of his job as Senior Copyright Examiner, GS–12, for racially discriminatory reasons and for exercising his First Amendment right of free speech in challenging what he saw as employment discrimination at the Library. The Library claims Williams' employment was terminated because he made material misstatements about his employment qualifications.

### I.

In an amended complaint, Robert L. Bostick joined Williams as plaintiff, and together they sought to represent all black persons who worked or applied to work at the Library since 1960. On behalf of the class, they sought relief for a wide variety of employment practices dealing with recruitment, hiring, promotion, and termination alleged to violate Title VII of the Civil Rights Act of 1964,[1] as well as the First and Fifth Amendments to the Constitution. On August 20, 1973, Chief Judge William B. Jones denied plaintiffs' motion for class certification and severed the claims of Williams and Bostick.[2] Our Court of Appeals dismissed plaintiffs' appeal of that ruling,[3] and on February 12, 1976, Chief Judge Jones denied plaintiffs' motion for reconsideration of the class action determination. This memorandum deals only with the claims of Williams.

Initial pretrial proceeded under the supervision of Judge Jones until November of 1977, when the case was reassigned. There followed additional elaborate pretrial proceedings and a trial to this Court extending over seven days. At the trial, plaintiff, some Library employees friendly to him, and the principal Library officials involved in his case, appeared and testified at length; voluminous documentation was received in evidence. In the course of the pretrial and of the trial, the Court denied plaintiff's renewed motion for class action certification and refused to receive in evidence plaintiff's proffers of expert and other testimony about employment discrimination at the Library generally. On the basis of the relevant evidence of record, as summarized in the narrative below, the Court will enter judgment for Williams. Injunctive relief appropriate to the special circumstances of this case will be granted, and Williams' prayer for back pay will be denied.

*Williams' Activities at the Library of Congress*

Williams obtained his first job at the Library in 1967 as a GS–4 in the law library. He had graduated from Howard University and had earned one year's credit for legal studies at the Dalhousie Faculty of Law, Halifax, Nova Scotia. Believing, with some reason, that the Library preferred law students for positions in the law library, Williams falsely stated on his application that he was attending "Georgetown," leaving the erroneous impression by this and other statements and by his conduct that he was in the process of completing law school. A few months later, Williams obtained a GS–7 position as an examiner in the Library's Copyright Division. Believing, again with reason, that the Copyright Division preferred examiners who were law students or lawyers, Williams falsely represented that he was then attending law school.

By 1971, Williams had performed at least satisfactorily as an examiner and had risen to Grade GS–11. When a position as Senior Copyright Examiner GS–12 became vacant, Williams applied. He did not win the position despite his taking the calculated risk of representing (falsely) that he had attended Georgetown from 1966 through 1970 and had received a J.D. degree there.

Meanwhile, soon after his employment at the Library, Williams began to exhibit lawyer-like skills far exceeding those normally found in a law student or a novice lawyer. He was accepted at the Library as if he had

---

1. 42 U.S.C. § 2000e *et seq.*

2. *Williams v. Mumford,* No. 1633–72 (D.D.C., Aug. 20, 1973).

3. *Williams v. Mumford,* 167 U.S.App.D.C. 125, 511 F.2d 363 (1975) (rehearing *en banc* denied), *cert. denied,* 423 U.S. 828, 96 S.Ct. 47, 46 L.Ed.2d 46 (1975).

credentials as a lawyer, and represented employees with grievances about unfair employment most effectively. In 1970, Williams was elected president of Local Employees Union AFGE Local 1826, and general counsel of an organization known as the Black Employees of the Library of Congress. Appearing for his union at a meeting with Library officials about employment practices, he attracted the favorable attention of Robert W. Hutchison, Director of Personnel at the Library. To Hutchison, Williams showed great promise as a leader. Hutchison noted Williams' ability to articulate the problems, viewpoints, and concerns of union members, to deal reasonably, to see the management side, and to act with integrity in dealing with the concerns of others. Hutchison described Williams as a leader and *ad hoc* lawyer who was "needed at the Library."

In 1971, minority employees in the Library's Stack and Reader Division chose to express their dissatisfaction with Library employment practices by conducting a work stoppage. After consultation with the Department of Justice, the Library discharged a number of the participating employees. Williams interceded on their behalf, and represented them in an unsuccessful attempt to regain their jobs by appeal through the Library's administrative process.

In the wake of the Stack and Reader episode, Williams made a presentation about Library employment practices to some Library officials, including Ms. Barbara Ringer, then Assistant Register of Copyrights. Williams' presentation alerted Ms. Ringer to the depth of the feeling of minority employees and what she came to see as the justice of their grievances about recruitment and promotion of minority employees. She obtained authority from her superior, Register of Copyrights Abraham

Kaminstein, to attempt some administrative redress of these grievances. In the process she wrote a memorandum to the Librarian. The memorandum was not well received by the Librarian; he strongly criticized her for it. About one month after Ms. Ringer began her effort to improve administration to relieve some of the minority employee grievances, Ms. Ringer's administrative authority was revoked by Kaminstein pursuant to a directive by the Librarian. Thereupon, the Librarian retired Kaminstein from his office as Register, and, without proper competition or posting, persuaded George Cary, another Assistant Register, to take Kaminstein's place as Register.[4] Williams actively and publicly opposed the appointment of Cary as Register and circulated a controversial petition supporting Ringer for the position. Cary testified here that he considered himself to be an "old fashioned" person who believed in merit promotion for people who do their job, but who did not believe in promoting people who "spend their time making a lot of noises which is distractive of the efficiency of any office." He testified that while he had recognized that the union had a place, Williams spent too much time on union activities.

When Congress was considering legislation to extend Title VII to employees of the executive branch of the federal government, Williams drafted and successfully advocated legislation to include employees of the Library of Congress within Title VII.

In 1971, as Cary was replacing Kaminstein and Ms. Ringer was becoming occupied outside the Copyright Division in international copyright affairs at the United Nations Educational, Scientific and Cultural Organization, Williams undertook and pursued a personal appeal to the American Library Association Council about employ-

4. Ms. Ringer subsequently brought an action before Chief Judge Jones in which she successfully challenged the procedure followed by the Librarian in the appointment of Cary, *Ringer v. Mumford*, No. 2042–72 (D.D.C.1972) (Jones, C. J.).

Thereafter, on August 10, 1972, a Library hearing officer determined that there had been discrimination in the decision to select Mr. Cary instead of Ms. Ringer as Register. Following the correct procedure, the Library selected Ms. Ringer Register, replacing Cary, who retired. She holds that position now.

ment practices at the Library.[5] In June 1971, he presented to the Council a resolution calling for an inquiry into alleged discrimination in recruitment and promotion at the Library. Although John G. Lorenz, Deputy Librarian, personally spoke in opposition to the resolution and denied the existence of discrimination at the Library, the Council adopted the Williams resolution and commenced the inquiry. The Librarian himself, in response to an ALA request, formally ruled against Library cooperation with the ALA inquiry on the stated ground that it would be "unprecedented action for a professional association to investigate a Federal agency." The decision not to cooperate with the ALA inquiry was considered by the Librarian to be so important that he obtained the written approval of it from then Congressman Wayne Hays and Senator B. Everett Jordan, Chairman and Vice Chairman, respectively, of the Congressional Joint Committee which had oversight responsibility for the Library.

Despite the reaction of the Librarian, and of the leaders responsible for congressional oversight, Williams persisted in assisting the inquiry. The inquiry team later concluded that there was institutional discrimination (albeit inadvertent) in Library employment practices. The inquiry and report, originated and assisted by Williams, was highly publicized locally, nationally, and internationally. Many employees testified that Williams' role in the inquiry embarrassed the Library.

During all this time, Williams' falsification about his legal education had remained undiscovered. His work and his manner as an advocate and as a leader led his friends and his critics to believe him to be a trained and effective lawyer. Hutchison's assistant, Eugene Powell, testified, for example, that Williams effectively represented not only blacks at the Library, but also employees generally. As Herbert Belmaer, the Library's Employee Relations Specialist and Fair Employment Practices Officer, testi-

fied, Williams had legal expertise to cope with the Library system. He had an understanding of law and regulations. He was available to employees who couldn't hire a lawyer. And, as Belmaer and others testified, Williams was a "symbol to blacks." He was a "leader."

So, as was inevitable, it happened: in late 1971 or early January 1972, when Williams' ALA activity was reaching a crescendo, an instructor in the Copyright Division, reflecting about Williams' awkward responses to some technical legal problems in Copyright Division training sessions, began privately to question Williams' credentials. The instructor, on his own initiative, checked at Georgetown Law Center. There was no record there of Williams. The instructor reported his findings to his superiors. Confronted with this discovery, Williams confessed that in spite of his many statements and representations as to his status as a law student and later as a lawyer, he in fact was not a lawyer.

There ensued a protracted period of investigation during which Cary, Hutchison, and Lorenz met with Williams on a number of occasions to discuss his misrepresentations and the appropriate course of action for the Library. Williams attempted, without effective assistance of counsel, to explain his misrepresentations and protect his job. For example, he attempted to explain away his falsehoods in terms of the obstacles which confronted his early job applications, the tangled web which ensued, and his original (erroneous) assumption that he would be too obscure to be worth detecting. Meanwhile, he also persisted in his union work and his public opposition to Library employment practices, including the ALA investigation.

By March 1972, Cary had expressed his opinion to Hutchison by memorandum that the proper sanction for Williams' misrepresentations was termination. In June, having tried to make certain that the decision

---

5. The American Library Association is a private association of institutional members, including the Library of Congress, and private members, including Williams, well respected by the American Library community. It maintains a Standing Committee for the purpose of investigating employment policies and practices for its member institutions.

was correct and based on precedent, Hutchison finally gave his formal recommendation that Williams be terminated, which recommendation was accepted by the Librarian. As stated by Lorenz, Library management had made every effort to ensure that their action "could not be interpreted as a discriminatory action." Williams was notified that his employment would be terminated effective July 21, 1972.

On July 20, 1972, on the last day before termination, Williams was permitted to resign effective August 11, 1972. During this hiatus, Williams and friends tried unsuccessfully to arrange a demotion and transfer instead of termination. On August 9, he requested to withdraw his resignation. His request was denied and his job ended, requiring Williams to resign as president of Local Employees Union AFGE Local 1826, and as general counsel of the Black Employees of the Library of Congress. An administrative grievance complaint[6] and this suit followed.

### The Effect of Williams' Termination

Since his termination, Williams has remained active in Library of Congress employee affairs. He has been serving as executive director of the union at a salary approximately what he earned at the Library. But services available to employees at the Library in administrative proceedings involving discrimination have deteriorated since Williams' termination.

Although Library of Congress Regulations permit employees of the Library to take time from their regular duties to act as EEO representatives for employees with discrimination complaints, retaining their usual salaries,[7] there was evidence that the Library did not always cooperate enthusiastically with this program.

In response to questioning by the Court, one witness testified that part of the problem in resolving discrimination complaints relates to the absence of people who are willing and, more importantly, able to stand up for employees who have grievances; Williams was the only really efficient, effective person available. "[T]he major problem most people have is that they don't have skilled professional type representation through the EEO office." While the same witness testified that more recently the union for which Williams now works has provided representation for employees with discrimination grievances, the availability of this service remains subject to the union's contract, presently under negotiation. Ms. Ringer, Register of Copyrights, testified that employees are represented by counsel in the EEO process "infrequently" and that the negotiating process leading to union contracts has been slow and difficult.

### The Motive of Library Management

The Court finds that the Library decision to terminate Williams was significantly influenced by Williams' activities as a union leader and a black leader in opposing employment discrimination. Williams' complaints about employment practices at the Library, and particularly the Copyright Office, were not without foundation. Library management, therefore, had understandable reasons for reacting significantly to Williams' anti-discrimination activities. Over several trial days, the Court observed and questioned the Library officials who were in office when Williams' falsification was discovered—ironically, in the midst of his campaign against Library employment practices. These federal government officials, interacting with each other and reacting to their congressional overseers and to the Washington environment of the early 1970's, did not evidence the initiative and sensitivity about equal employment opportunity and about discrimination which other

---

6. The report of the EEO officers concluded: "The evidence submitted by Mr. Williams, the evidence developed during the investigation and the sworn testimony of witnesses, did not substantiate the charges brought by Mr. Williams." Investigative File of the Discrimination Complaint of Joslyn N. Williams 31 (1976).

7. Library of Congress Regulation 2010.3--1, *Resolution of Problems, Complaints, and Charges of Discrimination in Library Employment and Staff Relations Under the Equal Employment Opportunity Program,* § 5.

federal government officials then enforcing the civil rights laws demanded of managers of businesses, universities, state and city schools, and other local functions.

Vignettes impressed the Court:

Despite the obvious need to validate the requirement that copyright examiners hold law degrees (as evidenced by the recent abandonment of the requirement), the former Register, in charge of 300 employees, testified that he was unaware of the concept of "validation." When carrying out his responsibility for administering an affirmative action plan, the former Register refused to assemble information about the relative number of minority employees holding various positions in his office. The Librarian's unusual communication with Congressman Wayne Hays about the decision not to cooperate with the ALA investigation is special evidence of the intensity of Library management concern and reaction to Williams and his anti-discrimination activity. And Ms. Ringer's case evidences a state of mind in the Library managers consistent with this finding. The Court also notes that at the moment of decision to terminate Williams, the Register of Copyrights was Cary and not Ringer. The Court is influenced in its findings by the evidence of the circumstances which led to Cary's appointment to this key position in the decision-making process that terminated Williams.

The Court fully accepts the testimony of the Library officials that they were without prejudice or bias against minorities, in general, or Williams in particular. And the Court is impressed that Director of Personnel Hutchison, under new leadership, has been increasingly innovative and responsive to the letter and the spirit of Title VII. But the Court, sitting as a trier of fact, is persuaded from personal observation of the Library witnesses who dealt with Williams' case that they could not have failed to, and did in fact, react individually and as a group, with considerable intensity, to the threat and provocation inherent in Williams' efforts with respect to Library employment practices. It would have required saintly discipline for these particular Library managers not to be influenced in deciding to terminate him by hostility against his efforts to expose discrimination at the Library.

Record evidence strongly corroborates the informed conclusion of Ms. Ringer, the former Assistant, and now the incumbent, Register of Copyrights that Williams "told a lot of things like they were . . . and . . . this was just unacceptable to some people and was the ultimate cause of the events that led to the separation."

As Judge Weinfeld stated in a related context:

> Even if defendant was in part motivated by [the falsification], the court's finding that its [the defendant's] decision was also motivated by unlawful factors makes the suspension illegal. *Equal Employment Opportunity Commission v. Kallir, Philips, Ross, Inc.,* 401 F.Supp. 66, 72 n. 17 (S.D.N.Y.1975).

▪ The Court finds, therefore, for the reasons stated, that the Library decision to terminate Williams was motivated in substantial part by hostile management reaction to his leadership of the minority employees' protests against discrimination, in violation of Section 704(a) of the Civil Rights Act of 1964.[8] Accordingly, judgment will be entered for plaintiff.

## II.

Before turning to the question of relief, it is appropriate to set out in the record the Court's basis for two procedural rulings which counsel for plaintiff continually contested throughout pretrial and trial.

---

**8.** Section 704(a) of the Civil Rights Act of 1964 provides:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

*Denial of Class Certification*

■ Aware that Judge Jones' decision with respect to class certification remained provisional even as the action approached decision, the Court has reconsidered that decision and has found, in light of the facts as they have become apparent during pretrial and trial, that the decision was and is sound. Although suits alleging racial discrimination are often by their very nature class actions, careful attention to the requirements of Fed.R.Civ.P. 23 remains indispensable. Williams' mere allegation of racial discrimination does not insure that he will be representative of those who have been the actual victims. *See East Texas Motor Freight System Inc. v. Rodriguez,* 431 U.S. 395, 97 S.Ct. 1891, 1898, 52 L.Ed.2d 453 (1977) (relating to the adequacy of representation).

■ From the facts set out above, it is apparent that as a result of his activities, Williams occupied a special position at the Library, and that the decision to terminate him was not made in the ordinary course of Library management. The significant issue raised by Williams' case was whether the motive underlying his termination was retaliatory, not whether his termination was the result of racial discrimination. Williams' remarkable success at the Library belies any contention that he was the victim of any racial discrimination. His claim is, therefore, not typical of those of the class he seeks to represent and the factual issues involved in his claim are not common to the claims which black employees generally might have. *Compare Satterwhite v. City of Greenville,* 395 F.Supp. 698 (N.D.Texas 1975), *remanded for further proceedings,* 557 F.2d 414 (5th Cir. 1977), *Kinsey v. Legg, Mason & Company, Inc.,* 60 F.R.D. 91 (D.D. C.1973). The Court, therefore, reaffirms the conclusion that it would have been inappropriate to clutter the trial of Williams' claim with issues of systemic discrimination from which Williams did not suffer. *Compare Mason v. Calgon Corporation,* 63 F.R.D. 98 (W.D.Pa.1974), *Davis v. Ameripol, Inc.,* 55 F.R.D. 284 (E.D.Texas 1972).

*Exclusion of Evidence of Systemic Discrimination*

■ Plaintiff has proffered voluminous evidence of "systemic discrimination" on the part of the Library in many aspects of its treatment of employees. This evidence has been admitted for the limited purpose of showing that Williams' protests were not without foundation, and that the public denials made by Library officials in the face of that evidence demonstrated a need for representational services like those performed by Williams. It has been excluded on the other issues Williams has raised notwithstanding the importance generally attached to this type of evidence, even in cases involving only individual plaintiffs.[9]

In order for Williams to challenge successfully the routine employment practices of the Library, under the evidentiary scheme set out in *McDonnell Douglas,* he would have to show some unfavorable treatment, analogous to the refusal to hire Green in *McDonnell Douglas.* After he had produced evidence of different treatment from that received by other employees, the burden would shift to the Library to articulate some legitimate, non-discriminatory justification for its actions. Only then would the type of evidence Williams has sought to introduce become material. At that point it would be Williams' burden to show that the non-discriminatory justification was mere "pretext." Williams has not succeeded in reaching the first step of this scheme. The evidence reveals that until the discovery of his misrepresentation, he suffered no employment disadvantages. There is no reason, therefore, to allow Williams to demonstrate discriminatory motive in other employment decisions.

Nor is the evidence of systemic discrimination admissible to show discriminatory motive in the decision to terminate Williams. This case is distinguishable from *Kinsey* because of the *sui generis* process by which the decision to fire Williams was

9. *E. g., McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), *Kin-*sey *v. First Regional Securities,* 557 F.2d 830 (D.C.Cir. 1977).

made. In *Kinsey* the refusal to hire the plaintiff was made in the ordinary course by personnel charged with making routine employment decisions. Williams brought before the Court individuals who had devoted considerable attention to the decision. This testimony contained substantial evidence of the motives of these witnesses, much more probative than that contained in Williams' proffer. In light of the Court's finding on the question of motive, the exclusion of this evidence cannot be said to have prejudiced Williams.

### III.

*Relief*

Entry of judgment for Williams and against the Library does not, of course, end this action in equity. The Court must fashion a decree which attempts to remedy the situation created by the retaliatory termination of Williams without rewarding him for making significant and repeated false representations of his legal education and credentials.

The Court is authorized to grant tailor-made injunctive relief by the broad language and legislative history of § 706(g) of Title VII, 42 U.S.C. § 2000e–5(g):

If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to reinstatement or hiring of employees, with or without back pay . . . or *any other equitable relief as the court deems appropriate.* (Emphasis added.)

In *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), the Supreme Court set out some of the legislative history of this section and commented on the purposes underlying the broad language:

"In dealing with the present section 706(g) the courts have stressed that the scope of relief under that section of the Act is intended to make the victims of unlawful discrimination whole, and that the attainment of this objective rests not only upon the elimination of the particular unlawful employment practice complained of, but also requires that persons aggrieved by the consequences and effects of the unlawful employment practice be, so far as possible, restored to a position where they would have been were it not for the unlawful discrimination." 118 Cong.Rec. 7168 (1972).

As this makes clear, Congress' purpose in vesting a variety of "discretionary" powers in the courts was . . . to make possible the "fashion[ing] [of] the most complete relief possible." 422 U.S. at 421, 95 S.Ct. at 2373 (quoting from a Section-by-Section Analysis introduced by Senator Williams to accompany the Conference Committee Report on the 1972 amendments to Title VII).

Judge Gasch of this Court recently held in *Smith v. Califano,* 446 F.Supp. 530 (1978), that an agency has the authority under Title VII to award attorneys' fees to a party who prevails at the administrative level, and that district courts may review agency decisions not to award attorneys' fees. Judge Gasch's analysis of the interrelatedness of the administrative and judicial mechanism for enforcing the rights created by Title VII is particularly germane here. If attorneys' fees may not be awarded for service to employees contesting discrimination at the administrative level, a strong incentive is created for the employee (and his attorney if he has one)[10] to treat an

---

10. The desirability of representation in the administrative process is recognized by the Civil Service Commission Regulations at 5 C.F.R. § 713,214(b), which provide that an employee may be represented by counsel throughout the EEO administrative process beginning with the counseling stage, and by Library of Congress Regulation 2010.3–1, which in section 5 provides that an employee shall have the right to be accompanied, represented, and advised by a representative of his own choosing. The Library's regulation seems also to recognize the financial burden obtaining proper representation may pose for the employee. As mentioned

administrative remedy provided by the agency as a pro forma formality which must be played out before the merits of the grievance can be seriously aired for the first time in court. Where this incentive is combined with a demonstrated hostility on the part of an agency toward employees who assist other employees in obtaining relief for violations of Title VII, the administrative grievance procedure is likely to lose its dispute resolving capability, thereby exacerbating the effects of discrimination in the agency and imposing a disproportionate burden on the courts. This condition requires special measures to insure the utility of the administrative process.

■ Relief inuring directly to the personal benefit of the plaintiff is not the exclusive equitable relief device available to the courts for redressing this violation of Title VII. *Saracini v. Missouri Pacific Railroad Co.,* 431 F.Supp. 389, 395–96 (W.D.Ark. 1977). "[T]he court has a special responsibility in the public interest to devise remedies which effectuate the policies of [Title VII] as well as afford private relief to the individual employee instituting the complaint." *Sprogis v. United Air Lines, Inc.,* 444 F.2d 1194, 1201 (7th Cir. 1971) (citations omitted).

The decision of the Supreme Court in *Albemarle,* limited the discretion of trial courts to refuse to order back pay in Title VII cases, and required that if the District Court does decline to award back pay, it carefully articulate its reasons. 422 U.S. at 421, n. 14, 95 S.Ct. 2362. The standards governing the exercise of discretion which the Supreme Court found in the statutory scheme require that "backpay . . . be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through

past discrimination." 422 U.S. at 421, 95 S.Ct. at 2373. The awarding of back pay serves the statutory purpose of eradicating discrimination by providing " 'the spur or catalyst which causes employers . . . to self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges of an unfortunate and ignominious page of this country's history.' " 422 U.S. at 417–18, 95 S.Ct. at 2371–72. This purpose is not frustrated by the relief to be granted here which denies Williams back pay because of his false statements but provides relief for the public interest damaged by the retaliatory element of the decision to terminate him.

■ Williams was illegally discharged. But Williams also falsely represented himself to be first a law student and then a law graduate. No court should take such calculated falsehoods lightly.[11] This is not a case of misrepresentation of a qualification which is significant only because a particular employer believed the qualification important for a particular job. Misrepresentation that one is qualified to act as a lawyer has significance, specially in a court of law, independent of the misleading of the employer. Williams' continuing charade also deceived those on whose behalf he acted in attempting to resolve employment grievances at the Library.

Despite Williams' deficiencies, as a practical matter, he was more willing and more able to represent employees with discrimination grievances at the administrative level at the Library than anyone else whose services were available to those employees. Record evidence supports the conclusion that neither Williams, as an outsider, nor anyone else has since provided the effective representation which Williams as an employee provided for his colleagues.[12] His ter-

---

earlier, it provides that employees may use official time to represent other employees with grievances.

11. Williams' misrepresentation may be a violation of 18 U.S.C. § 1001. Williams' employment application contained a notice that a false statement might be grounds for dismissal.

12. See p. 1122, *supra.* In addition to the testimony received during the trial, the Court solicited written submissions from the parties "describing existing Library procedures for the redress of employment discrimination griev-

mination has seriously diminished the representation available to minority employees of the Library, exacerbated the disputes at the Library about discrimination in employment, and diminished the confidence of minority employees in the fairness of the Library grievance procedures. These facts are dramatically evidenced by the filing of over 40 cases in this Court which might have been disposed of administratively if Library employees were better represented at the administrative level or had more confidence in this process.[13]

This unique case, therefore, requires a unique remedy: one which discharges the Court's responsibility for the enforcement of Title VII, serves the public interest in eliminating discrimination, and relates to the wrong suffered by the plaintiff but at the same time denies to him personally equitable remedies which would reward him for his own misconduct. For the reasons set out above, having entered judgment for Williams, the Court declines to award relief directly to him. Instead the Library will be directed by an order to be issued by the Court, after receiving proposals from the parties, to establish and contribute financially to the maintenance of a service for the benefit of Library employees with *bona fide* discrimination grievances which will enable them to employ legal counsel or lay spokesmen of their choice to counsel such employees and to represent them in administrative proceedings with respect to those grievances. This relief will benefit Williams in the limited and appropriate sense that it will serve the cause for which he strived. The union for which he now works can be considered as a possible participant in and beneficiary of the service. The relief will serve the public interest in amelio-

ration of employment discrimination. It will impose on the Library responsibility for rectifying the effects of its retaliatory termination of Williams.

ances (including the role of unions and outside counsel therein) . . .." Order of December 21, 1977. Defendant's Statement Describing Existing Library Procedures for the Redress of Employment Discrimination Grievances (Including the Role of Unions and Outside Counsel Therein) . . . , filed January 9, 1978, and Plaintiff's Submission . . . , filed January 24, 1978, further document the need for the effective representation at the administrative level which Williams attempted to provide.

**13.** Several of the 40 cases were filed by a single employee who had no lawyer and represented himself *pro se. See, e. g., Parker v. Boorstin,* No. 75–1772 (D.D.C. Aug. 31, 1976) (Jones, C. J.) and Judge Jones' observation that Parker's "engagement of counsel to guide him through the labyrinth of administrative law would serve him well. It would save him time, energy and expense and it would enable this Court to better focus on his complaints." Slip op. at 9.