### Joslyn N. WILLIAMS

v.

### Daniel J. BOORSTIN, Librarian of the Library of Congress, Appellant.

### No. 79–1684.

United States Court of Appeals,
District of Columbia Circuit.

Argued 11 June 1980.

Decided 3 Oct. 1980.

Mark N. Mutterperl, Atty., Dept. of Justice, Washington, D. C., with whom Alice Daniel, Asst. Atty. Gen., Charles F. C. Ruff, U. S. Atty., and Robert E. Kopp, Atty., Dept. of Justice, Washington, D. C., were on the brief, for appellant.

John A. Terry, Asst. U. S. Atty. and William Kanter, Atty., Dept. of Justice, Washington, D. C., also entered appearances for appellant.

Michael D. Hausfeld, Washington, D. C., with whom Jerry S. Cohen and Herbert E. Milstein, Washington, D. C., were on the brief, for appellee.

Before BAZELON, Senior Circuit Judge, TAMM and WILKEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILKEY.

Opinion filed by Senior Circuit Judge BAZELON, concurring in the result.

WILKEY, Circuit Judge:

We have before us the case of a man who engaged in an elaborate masquerade as a purported law student, applicant for the bar, then lawyer in order to obtain and keep a job whose specific required qualifications called for a lawyer. Unmasked, his decep-

tion exposed, he was discharged, and immediately thereafter brought suit against his former employer, the Librarian of Congress, alleging racial discrimination under Title VII.

It is not disputed that the plaintiff had lied on his job application where he misrepresented his academic credentials; it is not disputed that he lied on occasion during his employment to carry out his masquerade; it is not disputed that he continued to lie even after his superiors confronted him. The only issue is whether the plaintiff was fired in violation of his civil rights. The district court held that Title VII of the Civil Rights Act of 1964 [1] was violated by the Library of Congress when it terminated the plaintiff.[2] We reverse the district court on the ground that the employment discrimination standard laid down by the Supreme Court in *McDonnell Douglas Corp. v. Green* [3] is utterly inconsistent with a finding of discrimination in this case.

## I. FACTS

The appellee, Joslyn Williams, who was not a lawyer, held a lawyer's job as a GS–11 copyright examiner at the Library of Congress. As of 11 August 1972 the Library terminated his employment upon learning of his lack of qualification and misrepresentation of that fact. It was in June 1972 that Williams received notice of removal, but he was allowed to submit a letter of resignation in lieu of termination by the Library. Two days before the resignation was to become effective, he attempted to rescind his resignation. The Library refus-

ed to accept the withdrawal of the letter of resignation, so Williams was forced to leave the Library on 11 August. The Director of Personnel, Robert W. Hutchison, wrote a letter to appellee, dated 11 August 1972, stating the Library's reasons for continuing to insist on his resignation:

> As you know the Librarian had already approved removal action against you to be effective July 21, 1972. You received ample notice of the specific charges with right to reply, and written notice of final decision . . . . The Acting Librarian accepted your resignation with a departure date agreed upon three weeks past July 21, 1972, specifically August 11, 1972, because of your desire to effect an orderly transition and set in order certain employee union business in which you were engaged. This new date of August 11, 1972 was agreed to by the Library solely because of your involvement in these union matters, and because the agency considered it to be in its best interests to resolve these union matters with your assistance.[4]

Williams then filed suit under Title VII of the Civil Rights Act, 42 U.S.C. section 2000e–16, asserting that racially discriminatory reasons motivated the Library to terminate his employment and force him to resign.[5]

Williams started out at the Library in 1967 as a GS–4 in the law section. In a few months he moved up into a GS–7 slot where he was an examiner in the Library's Copyright Division.[6] By 1971 Williams had be-

---

1.  42 U.S.C. § 2000e *et seq.* (1976).

2.  *Williams v. Boorstin*, 451 F.Supp. 1117 (D.D.C.1978).

3.  411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

4.  *Reprinted in* Joint Appendix (J.A.) at 206–07.

5.  In a related case, *Bostick v. Boorstin*, 617 F.2d 871 (D.C.Cir.1980) a panel of this court heard the appeal of another employee of the Library of Congress who sued for employment discrimination. Bostick claimed that his job's "GS" classification was too low. Another panel of this court rejected the argument that im-

permissible racial factors were responsible for the Library's job classification scheme.

In *Williams v. Mumford*, 511 F.2d 363 (D.C.Cir.) (rehearing *en banc* denied), *cert. denied*, 423 U.S. 828, 96 S.Ct. 47, 46 L.Ed.2d 46 (1975), this court dismissed the appeal pressed by Joslyn Williams and Bostick challenging District Judge Jones' refusal to certify their lawsuit as a class action. Subsequently, the complaints of plaintiffs Williams and Bostick were severed by the district court. Memorandum and Order filed on 20 August 1973, *reprinted in* J.A. at 80.

6.  *See Williams v. Boorstin*, 451 F.Supp. 1117, 1119–23 (D.D.C.1978). After a trial Judge Oberdorfer made findings of fact which charted Williams' progression through the Library, and

come a GS–11 and he applied for the GS–12 position of Senior Copyright Examiner. He did not win this last spot.

Our exposition of the remaining factual considerations will quickly highlight three sets of facts: first, it is imperative to appreciate the depth and persistence of Mr. Williams' lies and their material relation to his original job and later promotions. Second, we will note Mr. Williams' genuine talent and impressive role as an advocate of employee, especially black-employee, rights. Third, we will look at the factual basis for the trial judge's inference that the Library retaliated against Williams, wrongfully removing him because of his advocacy.

### A. Lies and Misrepresentations

Williams is part of that too broad fellowship of educated men and women everywhere who "pad" their resumes inflating their apparent strengths. Unfortunately, Williams went beyond simple puffery and actually lied about his educational accomplishments. These false statements were criminal.[7]

Directly under a warning in bold type that "[a] false or dishonest answer to any question in this application may be grounds for rating you ineligible for Federal employment, or for dismissing you after appointment, and may be punishable by fine or imprisonment (U.S.Code, Title 18, Sec. 1001)," [8] Williams certified in his 27 January 1967 application[9] that his statements were true. In fact, they were false—and materially so. He had successfully complet-

ed only one year at Dalhousie University Faculty of Law, after which he was not permitted to return because of academic failure.[10] This contrasts with Williams' representation of two years of *successful* law studies at Dalhousie.[11] Furthermore, because he believed that the Copyright Division preferred to hire lawyers and law students as examiners,[12] Williams fabricated three years of law training at Georgetown University.[13] The truth, however, is that Williams never enrolled in, attended or audited classes at Georgetown.[14] He also misrepresented somewhat his college studies at Howard University, thus enhancing the number of credit hours he successfully completed.[15] To be sure, he did actually receive a Bachelor of Arts degree from Howard,[16] but this alone would not have entitled him to any consideration whatsoever for the position for which he applied in 1967, and Williams knew this.

Williams perpetuated false representations about his education throughout subsequent job applications for promotions to levels GS–7 and GS–11, and in an unsuccessful application for a GS–12 job. Though the opinion below reflected more-or-less the plaintiff's falsifications, the district court took a rather curious approach toward them. We are at a loss to understand the casual attitude evinced by the district court in the following quotation:

> By 1971, Williams had performed at least satisfactorily as an examiner and had risen to Grade GS–11. When a posi-

catalogued his various misrepresentations. We rely entirely on Judge Oberdorfer's factual findings. We do not, however, draw the same inferences he did.

7. 18 U.S.C. § 1001 (1976). The penalty for "false, fictitious or fraudulent" misrepresentations to an agency of the United States is a fine of up to $10,000, or imprisonment for not more than five years, or both.

8. *Reprinted in* J.A. at 135.

9. *See id.* at 132–35 (Application for Federal Employment (Form SF 71)).

10. *See* Stipulation of Facts, *reprinted in* J.A. at 47; *see also* J.A. at 159–61, 231–32.

11. *Id.* at 47–48, 132–36.

12. Trial Transcript at 7, *reprinted in* J.A. at 224.

13. *See* J.A. at 47–48, 132–36.

14. *See* Defendant's Request for Admissions and Plaintiff's Responses, *reprinted in* J.A. at 66, 76; *see also* J.A. at 147, 232.

15. *See* J.A. at 156, 189, 230–31.

16. The degree was awarded 10 June 1960. *See id.*

tion as Senior Copyright Examiner GS–12 became vacant, Williams applied. He did not win the position *despite his taking the calculated risk of representing (falsely)* that he had attended Georgetown from 1966 through 1970 and had received a J.D. degree there.[17]

The court continued in this curious vein, stating

> soon after his employment at the Library, Williams began to exhibit lawyer-like skills far exceeding those normally found in a law student or a novice lawyer. He was accepted at the Library *as if he had credentials as a lawyer*, and represented employees with grievances about unfair employment most effectively.[18]

Since Williams was not a lawyer and did not have the legal training he claimed, the "calculated risk" he took was nothing less than intentional deception. Williams' job called for a lawyer but was occupied instead by a mountebank; like nearly all mountebanks successful for a time he had talent in the role he attempted, and probably could have been equally successful in a related field not requiring repeated falsifications had he chosen to pursue his career honorably.[19]

There is ample evidence in the record that Mr. Williams was hired for lawyers' jobs, because among all the applicants he appeared to be relatively better qualified on the scale of legal education.[20] In fact, when his application for a promotion to a full-time job at GS–7 in the Copyright Office was considered, the Personnel Action Recommendation recited in detail his (purported) academic credentials, stating that Williams "will receive his LL.B. degree [from Georgetown] in June 1969."[21] The Recommending Officers were impressed with Williams. They wrote:

> Although Mr. Williams does not entirely meet the *posted qualifications* in that he *does not yet have a law degree*, we believe that his varied experience and his overall qualifications make him an unusually promising applicant. We therefore request that *an exception* be made to the posted qualifications.[22]

In a later memorandum, one of the Recommending Officers confirmed that "[i]t was principally because of his alleged past and continuing law school experience that we decided to recommend Mr. Williams' appointment as a Copyright Examiner."[23] As noted above, Williams perpetuated his story in each of *four* job applications including the entry-level one. He perpetuated his ruse by "acting like a lawyer"—in the words of the district court, "[leading] his friends and his critics to believe him to be a trained and effective lawyer"[24]—and requesting leave in 1970 and again in 1971 supposedly to study and sit for the Maryland bar examination.[25]

Naturally—or, at least reassuringly—it was discovered eventually that Williams as a lawyer was a fake. In a Library training session on copyright law, Williams apparently did not quite "think like a lawyer," thereby arousing the suspicion of the instructor. This suspicion prompted an investigation. The complete record of continuous deceit was then revealed, and, after a period of stubborn false denials, subsequently conceded by Williams. An egregious record like this one hardly poses the ideal case for a whisper of a racial discrimination complaint, let alone an employment discrimination lawsuit.

---

17. *Williams v. Boorstin*, 451 F.Supp. 1117, 1119 (D.D.C.1978) (emphasis added).

18. *Id.* at 1119–20 (emphasis added).

19. It was gaps in his claimed educational background which were eventually noticed by his superiors, resulting in the inquiry which unmasked him.

20. *See* Personnel Action Recommendation, *reprinted in* J.A. at 137–38.

21. *Reprinted in* J.A. at 139–40.

22. *Id.* at 140 (emphasis added).

23. *Id.* at 155.

24. *Williams v. Boorstin*, 451 F.Supp. 1117, 1121 (D.D.C.1978).

25. Trial Transcript at 146, *reprinted in* J.A. at 234.

### B. Williams as Advocate and Employee Representative

In the words of the district court, Williams "was a 'leader,' " he "was a 'symbol to blacks.' "[26] The record supports this characterization, and we accept it. Neither these accomplishments, nor the personal tragedy exemplified in Williams' rise and fall, however, convert this unsuccessful masquerade into a valid Title VII discrimination claim. Obviously, Williams was talented and articulate. He would have to be. He was, after all, promoted on various occasions and had gained the respect of his superiors and fellow workers. He was elected in 1970 as president of Local Employees Union AFGE Local 1826, and as general counsel of the "Black Employees of the Library of Congress" organization.[27] Williams led several personal appeals raising questions about employment practices in the Library. In one extramural appeal, Williams presented a resolution to the American Library Association Council "calling for an inquiry into alleged discrimination in recruitment and promotion at the Library."[28] The inquiry was undertaken over the Library's objection, and with the diligent assistance of Williams.[29] The record easily supports the view that Williams was a skillful and effective advocate; one whose efforts to combat alleged prejudice might have been described as "militant."[30]

### C. Facts Relating to the District Court's Inference of Retaliation

We have noted in the preceding section that Williams was a powerful proponent of the rights of black employees at the Library. There is also some evidence to support an inference that Williams' initiative and participation in the American Library Association Council ("ALA") inquiry may have embarrassed the Library.[31] The district court's next step in the chain of inference, however, was something of a *post hoc, ergo propter hoc* conclusion. The court wrote:

> So, as was inevitable, it happened . . . when Williams' ALA activity was reaching a crescendo, an instructor in the Copyright Division, reflecting about Williams' awkward responses to some technical legal problems in copyright training sessions, began privately to question Williams' credentials.[32]

Simply concluding that "there was evidence that the Library did not always cooperate enthusiastically" in administrative proceedings, the court was impressed with the testimony of "one witness . . . that part of the problem in resolving discrimination complaints relates to the absence of people who are willing and, more importantly, able to stand up for employees who have grievances; Williams was the only really efficient, effective person available."[33] The court found that since Williams' antidiscrimination pursuits were not entirely unfounded, the "Library . . . had understandable reasons for *reacting significantly* to Williams' anti-discrimination activities."[34] Furthermore, the court was persuaded that there was

> threat and provocation inherent in Williams' efforts with respect to Library employment practices. It *would have required saintly discipline* for these particular Library managers not to be influenced in deciding to terminate him by hostility against his efforts to expose discrimination at the Library.[35]

---

26. *Williams v. Boorstin*, 451 F.Supp. 1117, 1121 (D.D.C.1978).

27. *Id.* at 1120.

28. *Id.* at 1121.

29. *Id.* It appears that "[t]he inquiry team later concluded that there was institutional discrimination (albeit inadvertent) in Library employment practices." *Id.*

30. *See id.* at 1123; Brief for Appellee at 39.

31. *Williams v. Boorstin*, 451 F.Supp. 1117, 1121 (D.D.C.1978).

32. *Id.*

33. *Id.* at 1122.

34. *Id.*

35. *Id.* at 1123.

Again, we see signs of *post hoc, ergo propter hoc* in the court's inferences which it couched in the subjunctive language underscored above. What "could have been" is never alone a sufficient foundation for a *finding* of what really "was," and what "could have been" is the language of the district court on this point. The district court recites no act, word or deed hostile or discriminatory to Williams, either in his presence or among Williams' superiors in private, prior to their discovery of his career of complete deception.

Though the court below somehow found that the Library management was "hostile" to Williams' leadership role,

> [t]he Court fully accepts the testimony of the Library officials that they were without prejudice or bias against minorities, in general, or Williams in particular.[36]

This conclusion, we agree, is easily warranted by noting Williams' rapid rise through the GS levels at the Library as well as recalling an exception made to the posted qualifications that had opened up a job for him.[37] What the record plainly demonstrates is that Williams' superiors were always favorably impressed with his ability, his poise and articulateness, and that they were convinced of his promise as a continuing Library employee.[38] This is what "was," and this obviously refutes speculation as to discrimination which only "could have been."

## II. ANALYSIS

Williams' undetected lies induced the Library of Congress to hire him just as the revealed lies later induced the Library to fire him. This is the admitted *lawful* motive for the discharge. The question in this case, then, is only whether the Library terminated him also in *unlawful retaliation* for (a) his opposition to alleged discrimination by the Library and (b) his participation in antidiscrimination efforts, both protected activities under Title VII.[39] We reverse

---

**36.** *Id.*

**37.** *See* note 22 & accompanying text *supra.*

**38.** *E. g.*, Personnel Action Recommendations, *reprinted in* J.A. at 139–40, 142–43; United States Government Memorandum, *reprinted in* J.A. at 198–200.

We realize that the district court may have been influenced by some evidence of discriminatory practices by the Library with regard to other Library employees. In fact, the court's decision can really only be explained in the context of broad-based discrimination which was strongly argued to the district court by the plaintiffs, and to this court on appeal. This suit is not a class action. *See Williams v. Mumford, supra* note 5, 511 F.2d 363. Consequently, in this case, evidence of systematic or general instances of discrimination can only be collateral to evidence of specific discrimination against the actual plaintiff. We deplore whatever instances of discrimination have occurred at the Library. We applaud any efforts, including those of Williams, to redress each violation of civil rights. But the case at bar concerns Williams only and we are unavoidably constrained by the facts pertaining directly to his case. At the very least, it is inappropriate to rely on extrapolation from general evidence of discriminatory episodes when there is available specific evidence directly relevant to the particular plaintiff.

The district court was evidently ambivalent; it has provided us with a contradictory message regarding discrimination against Williams himself. The court's inferences are in contrast with undisputed facts. For example, we have quoted in text where the district court explicitly accepts that the Library management was without animus toward Williams. The specific evidence here does not support an inference of discrimination against one Joslyn Williams. This, of course, explains in part why the district court held for the plaintiff but declined to reinstate him in his position at the Library. The court ordered instead a "unique remedy" requiring the Library "to establish and contribute financially to the maintenance of a [legal fund] service for the benefit of Library employees with *bona fide* discrimination grievances." 451 F.Supp. at 1127. In light of our holding that there was no violation of Title VII and after Congress's Act of September 30, 1978, Pub.L.No.95–391, § 308, 92 Stat. 789, barring public expenditures by agencies for legal representation of employees (unless authorized by Congress), the remedy is as moot as it is "unique."

**39.** Specifically, the provision reads:

(a) It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate

and hold that the district court's analysis of its own factual findings misapplied the applicable legal standard enunciated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

## A. *The* McDonnell Douglas *Standard*

■ The *McDonnell Douglas* standard prescribes the sequence of proof which a rejected job-applicant must offer to establish an instance of discrimination in the workplace under Title VII. Likewise, *McDonnell Douglas* applies in retaliation cases where employers discharge or fail to promote employees who have engaged in activities fighting discrimination.[40] The *McDonnell Douglas* approach directs a Title VII plaintiff to make out a *prima facie* case of retaliation, thus shifting to the defendant employer the burden of rebuttal. The employer then may demonstrate a legitimate and nonretaliatory reason for discharging or not promoting the plaintiff. Such a reason would dispel the inference of retaliation. Classic examples of legitimate reasons might be the plaintiff employee's lack of qualifications or subsequent disqualification, or, the elimination of the job for other business purposes.[41] If the employer adduces a lawful reason for his adverse act,

the employee may show, in the final step of *McDonnell Douglas* analysis, that the employer's reason is merely a "pretext" covering up unlawful retaliation through the guise of innocent business planning. *McDonnell Douglas* is thus more like a map of shifting burdens than it is like a substance-laden rule. "Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination."[42]

■ In the guidelines for a *prima facie* case *McDonnell Douglas* suggested one critical element for evaluating Title VII claims of employment discrimination. That factor is one of adequate *qualification* for the job on the part of the complaining employee.[43] Qualification on the part of the employee, then, would seem to be almost indispensable to a Title VII violation.[44] Title VII imports no suggestion that the less qualified shall be favored over the more qualified simply by virtue of their connection with some protected antidiscrimination activity.[45] No good reason exists for allowing a nonqualified employee to invoke Title VII to cure deficiencies in his or her qualifications, or to immunize potentially serious defects in the worker's job profile. It would be incongru-

against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter. 42 U.S.C. § 2000e–3 (1976).

**40.** For Title VII retaliation cases applying *McDonnell Douglas, see, e. g., Womack v. Munson*, 619 F.2d 1292, 1296 (8th Cir. 1980) (rehearing and rehearing *en banc* denied); *Williams v. Bell*, 587 F.2d 1240, 1245–46 n.45 (D.C. Cir.1978); *Rogers v. McCall*, 488 F.Supp. 689, 699 (D.D.C.1980).

**41.** *See International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 358 n.44, 97 S.Ct. 1843, 1866 n.44, 52 L.Ed.2d 396 (1977). We recognize that the issue of "qualifications" is relevant at each stage of *McDonnell Douglas* analysis. It arises first in the context of a *prima facie* case, but as the crucial factor in employer-employee relations qualifications are as important at the "rebuttal" stage and at the "pretext" stage. *See* notes 42–45, 54–55 & accompanying text *infra*.

**42.** *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978).

**43.** *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. Other elements of the *prima facie* case include: membership in a racial minority, application and rejection from an available job, applications for same job entertained by employer, qualifications of other applicants equivalent to those of complainant. *Id.*

*McDonnell Douglas* is to be flexibly applied to different circumstances, of course. *See McDonald v. Santa Fe Trail Trans. Co.*, 427 U.S. 273, 279 n.6, 96 S.Ct. 2574, 2578, n.6, 49 L.Ed.2d 493 (1976).

**44.** *See Womack v. Munson*, 619 F.2d 1292, 1296 (8th Cir. 1980) (rehearing and rehearing *en banc* denied) (applying *McDonnell Douglas* in case of retaliatory termination).

**45.** *See Griggs v. Duke Power Co.*, 401 U.S. 424, 436, 91 S.Ct. 849, 856, 28 L.Ed.2d 158 (1971).

ous—and certainly not required by law—to give any employee, even one engaged in exemplary efforts to vindicate the law of the land, a stranglehold on a job irrespective of that employee's material, work-related flaws.

The *prima facie* showing relates qualifications of the particular employee to performance requirements of the particular job. A demonstration of pretext, on the other hand, relates the employer's actual treatment of the particular employee with his or her actual treatment of other employees in like situations. This line of inquiry may bring out comparative evidence tending to show that the official employment policy regarding the availability of jobs was just a sham—in other words, that an employer treated one group differently from another and was drawing impermissible race distinctions by granting *ad hoc* variances to the "policy" which allegedly fixed performance requirements.

If the pretext stage of *McDonnell Douglas* analysis is reached at all, it is then that the question of mixed causation—*i.e.*, retaliation plus legitimate business purpose—must be pondered. Appellant Librarian has argued that a Title VII violation is made out only if the employee would have retained his job *but for* any retaliatory motive.[46] Appellee Williams, on the other hand, argues that a "hint" of retaliation would suffice to make a showing of pretext and thereby prove a Title VII violation under *McDonnell Douglas.*[47] The cases cited to us by appellee imply, mostly by analogy, that adverse action against employees partially undertaken for lawful purposes and partially undertaken for unlawful retaliatory purposes constitutes a violation of Title VII.[48] The law in this circuit, however, is clear. The *but for* test applies.[49]

■ Adapting the language of *Day v. Matthews*[50] to this case, the *but for* test might be stated as follows: If the plaintiff has made a showing of "pretext," the defendant employer must then demonstrate by clear and convincing evidence that the plaintiff would have lost his job anyway absent retaliation for the plaintiff's participation in protected conduct. This standard is plainly correct, as it not at all precludes a finding of a Title VII violation when an employer acts from mixed motives. The mere presence of a legitimate purpose underlying the discharge will not sterilize unlawful retaliation, where the latter is in fact the dispositive cause. The *but for* standard simply compares the adversity faced by the plaintiff employee (who had engaged in conduct protected by Title VII) with conditions imposed on similarly situated employees who did not engage in protected conduct.[51]

### B. *The Standard Applied*

■ When the facts found by the district court and *McDonnell Douglas* are juxtaposed, it is plain that no Title VII offense has occurred here. Mr. Williams or any other Library employee, civil rights advocate or otherwise, could simply never be entitled to, nor expect to retain, his or her job after establishing such a formidable record of lying to his employer. Trustworthiness, reliability, veracity, good judgment—these are all material qualifications for any job, including one as a Copyright Examiner,

---

46. Brief for Appellant at 53.

47. Brief for Appellee at 44.

48. *E. g., Pettway v. American Cast Iron Pipe Co.*, 411 F.2d 998 (5th Cir. 1969); *EEOC v. Kallir, Phillips, Ross, Inc.*, 401 F.Supp. 66 (S.D. N.Y.1975).

49. *See Weahkee v. Perry*, 587 F.2d 1256 (D.C. Cir.1978); *Rogers v. EEOC*, 551 F.2d 456 (D.C. Cir.1977); *Day v. Mathews*, 530 F.2d 1083 (D.C.Cir.1976).

50. 530 F.2d at 1086.

51. *Cf. Mt. Healthy City Board of Ed. v. Doyle*, 429 U.S. 274, 286, 97 S.Ct. 568, 575, 50 L.Ed.2d 471 (1977) ("But that . . . [marginal] candidate ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision.") (Justice Rehnquist writing for a unanimous Court considering a First Amendment constitutional challenge against an unfavorable tenure decision).

a job also requiring of the office holder a law degree.

As noted above in Part A of this section, *qualification* of the complainant is the pivotal component of the *McDonnell Douglas prima facie* case. It is clear that from the outset Williams was *not qualified* for the job which he held. He was not a lawyer; the fact that his work product was respected by his superiors does not remedy the credentials gap. (It is significant that, as a practical matter, the absence of legal training showed up in Williams' responses to technical inquiries; the absence of credentials meant more than the lack of a piece of paper.) A lawyer is a lawyer—a non-law school graduate, who is not admitted to the bar, may attempt, with some success, to do a lawyer's job, but it will only be a deception and a fraud. The analogy to medicine is telling. A quack doctor may be acknowledged as providing some relief to some patients, yet once the lack of license is discovered, the liberty to practice is foreclosed, absolutely.

A second defect in Mr. Williams' *prima facie* case can be characterized as *disqualification.* The lying itself, also from the outset, made him an unfit employee of the Library of Congress, wholly apart from the question of his not being a lawyer or his serving well in assigned tasks. *The district court totally failed to appreciate the real-life decisions that an employer must confront.*[52] How could Mr. Williams have been retained? Could a responsible Librarian of Congress *overlook* the before, during, and after chain of falsehoods employed by Williams to keep his government job? What

would have been the morale of the other employees of the Library, their view of the standards of honesty, probity, good judgment required by (and of) their superiors to hold a position of trust and responsibility at the Library? (In this respect, Mr. Williams' achieved prominence made it even more difficult for a conscientious administrator to do anything but discharge him.) We must agree with appellant that

> since it is a criminal offense to make false statements on federal employment applications and termination of employment is a universally accepted disciplinary action in cases of this sort, it is clear that plaintiff would have been fired notwithstanding any retaliatory motive which may have existed.[53]

Under all the admitted circumstances, we think it virtually impossible for the Librarian to have acted other than to discharge Williams.

Though not required, it is sensible to double-check at this stage our holding of no *prima facie* case by considering the pretext question. There are, of course, illuminating interrelations among all of the Title VII considerations. We see that the *but for* test is easily satisfied in favor of the employer appealing to this court. The district court made no explicit finding that the Library's admittedly legitimate reasons for firing Williams were "pretextual." The employee's falsification, he admits and the district court found, was knowing and willful.[54] It was also criminal—a compelling factor in any employee retention decision.[55]

Not only is there no evidence that the Library was "just waiting" for an opportu-

---

52. *See Aikens v. United States Postal Service Board of Governors*, 642 F.2d 514 at 518 (D.C. Cir.1980) (Wilkey, J., dissenting) (dissent filed 9 September 1980).

53. Reply Brief of Appellant at 12.

54. *See* Trial Transcript at 158–59, *reprinted in* J.A. 237–38.

55. In the *McDonnell Douglas* case itself, the Court indicated that there was no statutory need for the defendant employer to hire a plaintiff employee who engaged in *unlawful* disruptive activity against the employer. 411 U.S. at 803 & n.17, 804, 93 S.Ct. at 1824, 1825 n.17.

The disruption in *McDonnell Douglas* was tainted and disqualified even though it implicated efforts to combat discrimination. The *illegality* in the instant case bears no relation to an affirmation of civil rights. Lying on application forms and in interviews is reprehensible and without justification as part of an antidiscrimination arsenal. If the appellee truly sought to topple what he may have believed were differential educational requirements for black and white Library employees, he could have challenged the allegedly invidious rule in an Equal Employment Opportunity Commission proceeding. A complainant with "cleaner

nity to invoke some spurious "legitimate" reason to sack Williams for embarrassing the Library by his vocal opposition of discrimination,[56] but it is quite clear that, *comparatively* speaking, Williams received only his due. In previous instances of falsification by Library employees, four were removed and one was demoted and transferred. The one who was *not* discharged was black, the race of the others is not known.[57] The district court inevitably recognized that the continued employment of Williams was untenable; presumably, the district court did not order Williams reinstated because of the anomaly and injustice to do so. The district court faulted the Library for disciplining an errant employee, but would not itself reward the mendacious plaintiff.[58] Williams was not a *victim* at all. He was the responsible agent in his own termination, "generat[ing] his own fate" by choosing an unlawful route to employment opportunity.[59]

## CONCLUSION

We believe that appellee was reasonably and lawfully discharged for his admitted falsifications and demonstrated failure of integrity. Consequently, the judgment below finding a Title VII violation is

*Reversed.*

BAZELON, Senior Circuit Judge, concurring in the result:

In view of the compelling legitimate reason for the defendant's action, the record does not support the finding that retaliation was a "substantial"[1] cause of dismissal. I therefore join in the court's judgment. I am not prepared, however, to agree with two problematic propositions of law unnecessary to the result.

First, neither precedent nor reason explains why an employee's qualifications must be a "critical element" of a discriminatory *dismissal* claim.[2] Contrary to the majority's suggestion, the Supreme Court in *McDonnell Douglas v. Green*[3] did not intend to define the elements of every employment discrimination claim;[4] that case involved a *refusal to hire*. The qualifications issued here, on the other hand, seems

---

hands" would have been a persuasive opponent of any veiled employment practices at the Library.

56. In fact, the evidence is to the contrary. Williams had received various promotions and favorable ratings. *See* notes 6, 20–22 & accompanying text *supra.*

57. *See* J.A. at 162, 214–16, 243, 267; Brief of Appellant at 15–22.

58. *Cf. Williams v. Boorstin,* 451 F.Supp. 1117, 1126 (D.D.C.1978) ("But Williams also falsely represented himself to be first a law student and then a law graduate. No court should take such calculated falsehoods lightly.") (footnote omitted).

59. *See Rogers v. McCall,* 488 F.Supp. 689, 699 (D.D.C.1980).

1. *Williams v. Boorstin,* 451 F.Supp. 1117, 1123 (D.D.C.1978).

2. Majority Opinion (Maj.Op.) at 116.

3. 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

4. Among the elements of a prima facie case listed in *McDonnell Douglas* was "that [the plaintiff] belongs to a racial minority." 411

U.S. at 802, 93 S.Ct. at 1824. In *McDonald v. Santa Fe Trail Trans. Co.,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), the Court found that Title VII prohibited discrimination against all races. The Court noted:

> Our discussion in *McDonnell Douglas Corp. v. Green* ... of the means by which a Title VII litigant *might* make out a prima facie case ... is not contrary. There we said that a complainant *could* establish a prima facie case by showing [that he belonged to a racial minority; applied and was qualified for a job for which he was rejected; and, the position remained open]. As we particularly noted, however, this "specification ... is *not necessarily* applicable in every respect to differing factual circumstances." *Id.* at 802, n.13, 93 S.Ct. at 18, 24 n.13.

427 U.S. at 279 n.6, 96 S.Ct. at 2578 n.6 (emphasis supplied). *McDonnell Douglas* offered only a "sample pattern of proof," which was "not ... an indication of any substantive limitation...." 427 U.S. at 279 n.6, 96 S.Ct. at 2578 n.6.

The majority contends that *Womack v. Munson,* 619 F.2d 1292, 1296 (8th Cir. 1980), and *Rogers v. McCall,* 488 F.Supp. 689, 699 (D.D.C. 1980), support application of *McDonnell Douglas* to retaliatory dismissal claims, *see* Maj.Op. at 115–116 & n.40. But in neither case did the court make "qualifications" an element of

to be an arbitrary barrier to consideration of the merits; the plaintiff was fired not because he lacked qualifications, but because he lied about them.

Second, the adoption of a "but-for" standard of causation is both unexplained and unnecessary to the decision here.[5] The majority finds that "[t]he law in this circuit ... is clear."[6] Although retaliation has been recognized as a dangerous threat "to the effectiveness of the Act,"[7] none of the cases relied upon by the majority involved retaliation.[8] Nor is any other explanation offered for this standard.[9] Moreover, in view of the court's ruling on the qualifications issue, its discussion of causation must be considered dicta.

retaliation; instead, these courts applied the standard found in B. Schlei & P. Grossman, Employment Discrimination Law 436 (1976) (prima facie case includes: (1) protected activity; (2) adverse employment action; (3) causal connection; burden then shifts to employer to show legitimate reason for dismissal). *See Gonzalez v. Bolger*, 486 F.Supp. 595, 601 (D.D.C.1980).

Outside this case law, no substantial reason is suggested why qualifications must be an element of a retaliatory dismissal claim. The majority's concern that a "nonqualified employee [will] invoke Title VII to cure [his] deficiencies," Maj.Op. at 116, seems to overlook the second stage of proof outlined in *McDonnell Douglas.* At that stage, the employer can respond to a prima facie retaliation claim by offering a legitimate reason for dismissal, which might include lack of qualifications.

5.  Maj. Op. at 117.

6.  *Id.*

7.  *EEOC v. Kallir, Philips, Ross, Inc.,* 401 F.Supp. 66, 72 (S.D.N.Y.1975) (Weinfeld, J.), *aff'd,* 559 F.2d 1203 (2d Cir.), *cert. denied,* 434 U.S. 920, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977). *See Pettway v. American Cast Iron Pipe Co.,* 411 F.2d 998 (5th Cir. 1969). Retaliation represents more than a discrete act of discrimination; it also threatens to chill enforcement of

the Act's guarantees. *See Gonzalez v. Bolger,* 486 F.Supp. 595, 601 (D.D.C.1980).

8.  *See* Maj. Op. at n.49 (*Weahkee v. Perry,* 587 F.2d 1256 (D.C.Cir.1978); *Rogers v. EEOC,* 551 F.2d 456 (D.C.Cir.1977); *Day v. Mathews,* 530 F.2d 1083 (D.C.Cir.1976)).

9.  The Eighth Circuit did apply the but-for standard to a retaliation claim in *Womack v. Munson,* 619 F.2d 1292 (8th Cir. 1980). *Cf. Monteiro v. Poole Silver Co.,* 615 F.2d 4, 9 (1st Cir. 1980) (retaliatory motive must be "determinative factor" of dismissal). But a lower causation standard was applied in *EEOC v. Kallir, Philips, Ross, Inc.,* 401 F.Supp. 66, 72 n.17 (S.D.N.Y.), where Judge Weinfeld rested a Title VII violation on a finding of "partial" retaliatory motivation. In *Gonzalez v. Bolger,* 486 F.Supp. 595, 602 (D.D.C.1980), the court considered whether the employer's claimed justification was "in fact a pretext for retaliatory animus...."

I do not suggest which of these standards is appropriate. These facts do not require us to choose a standard for this circuit; the evidence did not support the finding below that retaliation was a "substantial" cause of dismissal. I believe that under these circumstances it is inappropriate for the majority to adopt a higher standard than the one applied by the trial court.